**UNITED STATES**

v.

**Staff Sergeant James A. ROBINSON, Jr., FR 378–62–1914, United States Air Force.**

**ACM 24420.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 8 Sept. 1983.

Decided 18 Feb. 1986.

Appellate Counsel for the Accused: Mr. Clyde B. Pritchard, Detroit, Michigan, Mr. Mark A. Goldsmith, Birmingham, Michigan, Colonel Leo L. Sergi and Captain Bruce T. Brown.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert, Lieutenant Colonel Donal F. Hartman, Jr., Major Robert E. Ferencik, Jr. and Captain Joseph S. Kistler.

Before SESSOMS, CANELLOS and CARPARELLI, Appellate Military Judges.

## DECISION

CARPARELLI, Judge:

The appellant has been convicted of the rape, forcible sodomy, and premeditated murder of Senior Airman Nancy Nittler. He was sentenced to a dishonorable discharge, life imprisonment, total forfeitures, and reduction to airman basic. Appellate defense counsel have assigned five errors for our consideration. We find them all to be without merit and affirm the findings and sentence. We will, however, discuss the first assigned error. It asserts that an incriminating statement made by the accused on 19 October 1982 should have been suppressed because it arose from a hypnotic interview six months earlier, was involuntary, and was inadequately corroborated.

## I. FACTS

On the evening of 13 April 1982 the victim worked the night shift in Building 520, Ramstein Air Base, Germany. She worked alone as the civil engineering service call monitor. Because of an on-going construction project, she was unable to lock the main entrance to the building near the service call desk. That evening, between 2130 and 2230 hours, she was visited by other members of the civil engineering squadron. The last known visitor was Senior Airman Wood who stopped to get some maps. Senior Airman Wood testified that, as she left the building, about 2230 hours, she saw the victim preparing to go to sleep on a cot near the service call desk.

About 0615 hours the next morning Senior Airman Nittler's body was found in the career advisor's office, another room in the building. Examination of the body revealed that she had been brutally assaulted, raped, and anally sodomized. The body bore defense wounds on both forearms, two blunt instrument wounds on the head, internal and external injuries indicating strangulation, one superficial cut on the neck, and two deeper cuts, one of which severed her jugular vein and caused her death.

The cot in the service call room contained a large blood stain which someone had attempted to conceal by placing a blanket over it. Later examination of the flow pattern of the blood stain and experimentation with the cot showed that, at some time while the blood was fresh, the cot had been tipped on its side and later righted. There was blood splattered near the cot, another large blood stain on the floor, and a trail of blood leading to the next room, the technical order room. Except for the blood stains, however, neither the service call room nor the technical order room showed any signs of a struggle. A heavy and obvious trail of blood led from the technical order room, down a corridor to the career advisor's office. The body was found face down in the career advisor's office and was naked below the waist. The victim's head was near the door and there was a large pool of blood to the right of her head.

The pathologist concluded that the head wounds and strangulation had been inflicted in the service call room, the neck wounds had been inflicted in the career advisor's office, and the rape and anal sodomy had been perpetrated in the career advisor's office either before the victim's neck was cut or shortly thereafter while the victim was in the throes of dying. Analysis of the evidence at the crime scene

indicated that the victim had been dragged down the hallway by her feet after she had been rendered unconscious by the head wounds and strangulation.

All the blood stains were consistent with the victim's blood. None of the latent fingerprints found at the scene were identified as those of the appellant or any of the other suspects in the case. Pubic hairs were collected from the floor of the career advisor's office and examined by the criminal investigation laboratory. The laboratory was unable, however, to connect the hairs with any suspect.

Swabs from the victim's vagina and rectum and washings of the victim's pubic hair revealed the presence of semen. Comparison of these samples with relevant information regarding the appellant's blood type and body fluid chemistry indicated that the appellant could have been the source of the semen.

On the evening of 16 April 1982 the appellant went to the security police desk and said that he had some information regarding the crime. When questioned by an agent of the Office of Special Investigations (OSI) the appellant said he was driving past building 520 sometime between 2330 and 0030 hours on the night of the crime and, through a part in the window curtains, saw a tall male shadowy figure in the service call room. The figure had its right hand in the air and made several downward motions as if striking something. He described the figure as tall, thin, light-haired, and wearing a dark, possibly plaid, shirt. The appellant said he had seen the figure from his vehicle in the course of two to five seconds as he drove past the building. He explained that he drove home and did not think much of it at the time. He said he waited to report his observations because he wasn't sure of what he had seen and needed to get his thoughts together. When asked who he thought the figure was, the appellant named Sergeant Kevin B. Curtis. Curtis, in fact, was six feet four inches tall, weighed only 135 pounds, and was on duty all night across the street from building 520 on the night of

the murder. He had been quickly and publicly apprehended outside building 520 on the morning of 14 April after law enforcement agencies had responded to the crime scene.

On 27 April 1982 and again on 29 April 1982 the appellant agreed to undergo hypnosis in an effort to recall as much as possible about what he had seen. Video tapes of the entirety of both interviews were admitted as prosecution exhibits during cross examination of the hypnotist, Major Russell Hibler, Ph.D.

During the hypnotic interview the appellant said he was driving past building 520 and saw a tall white male swinging what appeared to be a piece of pipe or a stick. He described the assailant as having blond or light brown hair parted in the middle and standing a head taller than the victim, "Maybe five-six [sic], maybe a little shorter."

Two days later the appellant again consented to a hypnotic interview with the same psychologist and agents. At that time he described the assailant as much taller than the victim. He said the assailant looked similar to the victim's husband but was heftier.

During the next five months the appellant told others about what he had seen and he expressed his concerns and suspicions about the case. He also spoke with OSI agents on 2 July, 7 July, and 21 July 1982. On the first two occasions he continued to tell the OSI agents that he had merely driven past the crime scene and he provided additional information which tended to cast suspicion on Staff Sergeant Joseph Brownell, a friend of the victim. During the 7 July interview the appellant said that, after he arrived home in the early morning of 15 April, he saw a vision in which he saw a face and the lower portion of a jaw and a mouth which appeared to be chewing raw flesh. He described the jaw as similar to Brownell's. On 21 July he volunteered a claim that, before driving past building 520, he had sexual intercourse with a bar girl at the Scotch Bar in

Landstuhl. At trial, however, the bar girl contradicted this claim.

On 19 October 1982, the appellant was called in by OSI agents Lee and Thomas, waived his rights, and was interviewed as a suspect. The interview began about 1300 hours and ended about 0130 hours on 20 October. The OSI deliberately scheduled the interview to begin in the afternoon because the appellant's normal work shift was between 1600 and 2400 hours. The interview was conducted in a relaxed, low-key manner and included a one and one-half hour break and occasional shorter breaks. The questioning ended when the appellant said he was tired and wanted to go home. The appellant did not ask for counsel during the interview.

In the course of this interview the appellant again said that he had intercourse with a bar girl at the Scotch Bar. He reiterated that, after passing the crime scene and seeing the figures in the window, he had gone home and watched television. He again said that after arriving home, he saw a vision of a man's head with blood running out of his teeth. After the appellant maintained his account of the evening's events for about four hours, the OSI agents told him that no one else had reported visions of the sort he described. They also told him that his clothing on the night of the crime matched a report of a person seen in the vicinity of the crime near the time of the crime. In addition, they noted that others who had tried to see through the window of the service call room, under similar circumstances as the appellant had reported, were unable to observe comparable details. The appellant then explained that he did not drive straight home but instead circled back, got out of his car, and walked to the window. He said he saw the victim with her forearms in front of her face, trying to protect herself. He said she was struck above her eyes, on the side of her head, and possibly on her arms. As appellant watched her try to get away the assailant cut her on both sides of her neck.

When confronted with the possibility of evidence suggesting he may have been in-side the building, the appellant said he had gone in and saw the victim lying on the floor of the room next to the service call room. He reported that he was pushed from behind onto his knees and then heard footsteps going down the hallway. After being pushed he saw a gaping wound in the victim's neck and described it as similar to that made by a dog shaking a rabbit with its mouth. He said he went out to his car, sat in it for about ten minutes, and got in and out of it two or three times. He said that after fifteen minutes he went back in unarmed. He explained his seeming bravado by saying that he had once defended himself against a bear and that he performed best under stress or fear.

Although Special Agent Lee did not know or suggest that the cot in the service call room had been tipped over, the appellant explained that, upon re-entering the service call room, he found the cot tipped on its side with the legs toward the center of the room. He said that he put the cot on its legs and straightened up the room. He noted that this would explain the presence of his fingerprints in the room. He reported seeing a trail of blood leading to the career advisor's office. He described the bloody trail as being similar to that made when a deer is dragged by its hind quarters. He also noted that the trail thickened just in front of the career advisor's office and referred to it as a hesitation spot, as if the assailant had stopped and turned into the office. When the appellant told Lee that the victim had been left on the floor of the career advisor's office with her head near the door, Agent Lee doubted the accuracy of the description and questioned him more thoroughly. Lee had not seen the body at the scene and had misinterpreted a diagram and a photo in the investigative report. Despite Lee's questions, however, the appellant maintained his accurate description of the victim's position and did not yield to Lee's doubts.

Finally, after being told that chemical tests of semen taken from the victim's body could be used to identify the assailant, the appellant stated that he had sexual

intercourse with the victim as she lay unconscious in the career advisor's office. Nonetheless, he denied that he was the primary assailant and that he had anally sodomized the victim. When the appellant was asked to identify the primary assailant he said he was sixty to seventy per cent sure it was an Air Force member named Ron Stenson.

At the conclusion of the interrogation the appellant appeared calm. He said he felt better for having been able to talk about the incident. He also said he was a little tired and wanted to go home to be with his wife. He shook hands with Mr Lee and agreed to return the next day to continue the interview. The next morning the appellant was taken to see a psychiatrist. The psychiatrist described him as very depressed, teary eyed, and extremely frightened. The appellant also expressed suicidal ideations. He later told members of a sanity board that he was so confused that morning that he had been unable to identify his wife for the first half hour he was with her. Although the defense's expert witness regarding hypnosis declined to conclude that the appellant entered a trance state in the course of the interrogation, appellate counsel suggest that the length and stress of the interrogation may have had such a result.

## II. ADMISSIBILITY OF APPELLANT'S OCTOBER STATEMENTS

Appellate defense counsel have argued that the military judge erred when he denied appellant's motion to suppress the statements of 19 October. They contend that the length and circumstances of the October interrogation rendered those statements involuntary. Moreover, they say the statements were inadequately corroborated. Mil.R.Evid. 304(g). In addition to these considerations, appellate defense counsel also argue that the April hypnotic interviews had significant and lasting effects on the appellant and that these effects further undermined the appellant's free will during the October interrogation. They also refer us to various state court decisions regarding the inadmissibility of the testimony of witnesses who have been previously hypnotized. *See, e.g., Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983); *People v. Gonzales*, 415 Mich. 615, 329 N.W.2d 743, *order upon reconsideration*, 336 N.W.2d 751 (Mich.1983); *People v. Hughes*, 453 N.E.2d 484 (N.Y.1983); *State ex rel Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (Ariz.1982); *People v. Shirley*, 31 Cal.3d 18, 181 Cal. Rptr. 243, 641 P.2d 775 (1982), *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *State v. Mack*, 292 N.W.2d 764 (Minn.1980). They urge us to adopt the reasoning of those courts and to rule that, because the appellant had been previously hypnotized, the October statements were inadmissible *per se*. In the alternative they contend that the hypnotic interviews in April were contrary to Air Force directive, as well as, the guidelines applied to hypnotized witnesses by the Army Court of Military Review. Air Force Regulation 124–14, *Forensic Hypnosis*, 17 December 1981, paragraph 2*b.; United States v. Harrington*, 18 M.J. 797, 803 (A.C.M.R.1984). They argue that if this court is not inclined to adopt a rule of *per se* inadmissibility we should find that the failure to follow required guidelines in the course of the hypnotic interviews rendered all subsequent statements inadmissible. We decline to adopt either a *per se* rule or a guidelines approach in this case. Instead, we find well established rules regarding voluntariness and corroboration provide the best and most appropriate method of determining the admissibility of the appellant's October statements.

### A. *Evidence Regarding Hypnosis*

According to the testimony and the treatises admitted at trial, hypnosis is an altered state of consciousness in which an individual becomes more susceptible to suggestion and becomes less able to critically evaluate both his or her own thoughts and suggestions made by the hypnotist. Although accurate memories may be recalled and related during hypnosis, information developed in the course of hypnosis can also be

the result of confabulation rather than recall. Confabulation is the process whereby memory gaps are filled by mental images. The confabulated memories can arise from the imagination of the hypnotized subject and from intentional or unwitting suggestions from the hypnotist. 27:4 Int'l J. Clinical & Experimental Hypnosis (1979); Orne, Soskis, Dinges, Orne, *Hypnotically Induced Testimony*, in Eyewitness Testimony: Psychological Perspectives (G.L. Wells and E.F. Loftus ed. 1984); and Plotkin, *The Previously Hypnotized Witness: Is His Testimony Admissible?* 106 Military L.Rev. 163 (1984).

The evidence also showed that individuals differ in their susceptibility to hypnosis and that the question of whether a given subject is, in fact, hypnotized or is "simulating" or feigning a trance cannot be reliably determined even by experienced hypnotists. According to defense witness Doctor Martin T. Orne, an eminent authority on hypnosis, he and his wife are the only living hypnotists who have developed valid techniques to distinguish between hypnotized subjects and simulating subjects. The evidence also showed that subjects who enter a true trance, can, intentionally withhold information and can intentionally relate information which the subject knows is false.

Upon returning to a normal waking state a subject may exhibit equal confidence in the validity of natural memories and confabulated pseudo-memories. It is the combination of confabulation, a witness' apparent confidence in the validity of such pseudo-memories, and the danger that fact-finders will be unable to distinguish between testimony based on memory and testimony based on pseudo-memory, that gives courts concern about the use of hypnosis to assist witnesses to recall earlier events and observations.

## B. *Doctor Orne's Testimony*

In support of their position, trial defense counsel called and elicited testimony from Doctor Orne. The direct and cross examinations lasted four days. Doctor Orne concluded that, consistent with the evidence, but contrary to the appellant's assertions to others before the trial, appellant was drunk on the evening of the murder and suffered from gaps in his memory regarding the events of that evening. Doctor Orne said he had studied the video tapes of the hypnotic interviews and concluded that the appellant was, in fact, hypnotized and not simulating during the two interviews. He noted that the hypnotist told appellant that hypnosis could enable the appellant to recall reliable and more detailed information regarding his observations of the crime scene. In the course of the interview of 29 April the appellant was encouraged to "zoom in" and get a closer view of the events he said he saw. In addition, he was told that he could use some of the hypnotic relaxation techniques on his own and that he might thereby recall further details of the crime.

Doctor Orne testified that these suggestions could have various effects. First, the appellant was erroneously led to believe that the information developed in the course of the hypnosis was true and reliable recall. Second, once the appellant experienced the mental images during the supervised hypnosis or later self-induced states, he would be unable to distinguish them from other untainted memories. Third, other evidence regarding the appellant's relaxation habits and long-standing belief in his clairvoyance suggested the appellant would be inclined to self-induce hypnosis and further fill gaps in his memory with erroneous information. Most significantly, Doctor Orne testified that the use of the "zoom in" technique during the hypnosis could create in the appellant's mind a false mental picture of being close to the crime and, thus, create in him an erroneous belief that he was nearer the crime than he really was. The capstone of Doctor Orne's theory was that the appellant could not truly remember what happened on the night of the murder and that he yielded to the suggestions of his interrogators when their proposed explanations were consistent with his confabulated mental picture of having been near the crime.

During cross-examination Doctor Orne agreed that his theory was premised on certain essential determinations. First, that the appellant, in fact, had memory gaps regarding that night; and second, that the appellant was, in fact, hypnotized on 27 and 29 April and not simulating. Doctor Orne referred to the possibility that the accused entered subsequent trances as "reasonable conjecture." He conceded that he first conceived his theory in response to the specific facts of this case and that he was aware of no documented case in which the use of suggestive hypnotic techniques had caused an individual to alter his belief about where he was positioned while he observed the matters upon which the hypnotic session focused. He also agreed that his hypothesis did not explain how the appellant was able to provide accurate information about the crime and the crime scene.

## C. *Per Se Rules*

■ It is true that many state courts have adopted *per se* rules barring the testimony of a witness whose memory has been probed in the course of hypnosis. The issue facing those courts was whether information recalled and discussed by a witness during hypnosis was sufficiently reliable to be admitted as evidence and considered by a jury. In those cases the information sought to be admitted had been discussed during hypnosis and the relationship of the information to the hypnotic episode was evident. *Alsbach v. Bader*, 700 S.W.2d 823 (Mo.1985); *Kater, supra; Gonzales, supra; Hughes, supra; Collins, supra; Shirley, supra; Mack, supra.* The issue, as posed on appeal in this case, however, is not the competence of a witness to testify, the reliability of hypnotically recalled information, or the diminishment of an accused's ability to effectively cross-examine. The issue is whether statements made by a suspect six months after hypnosis, regarding matters not discussed or revealed during the hypnotic sessions, and tending to contradict the fundamental premise of his hypnotic statements, were sufficiently reliable to be admitted in that suspect's criminal trial. Neither the expert testimony nor the scientific treatises submitted to the court provides sufficient basis to establish a *per se* rule of inadmissibility to the facts of this case. We find that Doctor Orne's theory raised the issue of voluntariness for determination by the military judge as to the admissibility of the statements. It also presented factual issues regarding the trustworthiness of the statements for determination by the court-members on the question of guilt. *See, Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

## D. *The Use of Guidelines*

■ The Supreme Court of New Jersey has established guidelines regarding the use of information which has been discussed by a witness while under hypnosis. *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981). The guidelines address various aspects of hypnotic interviews and suggest procedures to minimize the risk of confabulation. Conformity with the procedures reduces the risk of confabulation, increases reliability, and, thus, enables the information to be used at trial. Failure to conform to them reduces reliability and weakens the argument for admission at trial. The Army Court of Military Review applied such guidelines in a well written decision in *United States v. Harrington*, 18 M.J. 797, 803 (A.C.M.R.1984). Like the *per se* rules, however, the guidelines approach addresses the admissibility of information revealed or discussed during hypnosis. As we have already noted, the issue before us is not the reliability of statements which are directly attributable to hypnosis. The issue is the admissibility of statements made six months later which address matters not revealed or discussed during hypnosis. We find that, despite appellant's arguments to the contrary, the guidelines approach was designed and adopted to confront facts, issues, and evidentiary concerns substantially different from those now before us. We, therefore, decline to apply such guidelines in this case.

E. *Air Force Regulation 124–14*

 Appellate counsel have also argued that the OSI acted contrary to Air Force Regulation (AFR) 124–14, *Forensic Hypnosis,* 17 December 1981, paragraph *2b* when they hypnotized the appellant. The cited paragraph states, "subjects of investigations who may be prosecuted must not be hypnotized unless the subject or subject's counsel requests it." The record before us, however, contains no evidence that the appellant had become the subject of the investigation at the time he was hypnotized. In addition, it is apparent that the cited provision was adopted to insure that investigators do not use hypnosis as a means of coercing subjects of investigations to confess. As such it addresses the issue of voluntariness, the same concerns as were addressed in *Leyra v. Denno, supra.* We find that AFR 124–14 was intended to provide operational guidance to Air Force investigators, judge advocates, and mental health professionals and was not intended to expand the protections afforded to hypnotized witnesses beyond those otherwise established in the Constitution and the Uniform Code of Military Justice. We will, therefore, determine the admissibility of the appellant's October statements on the basis of voluntariness and corroboration. *Wiley v. State,* 427 So.2d 283 (Fla. App. 1st DCA 1983); and *Coon v. State,* 380 So.2d 980 (Ala.1979), *vacated and remanded on other grounds,* 449 U.S. 810, 101 S.Ct. 58, 66 L.Ed.2d 14, *decision on remand* 405 So.2d 704, *aff'd on other grounds,* 431 So.2d 569 (1982).

F. *Voluntariness*

 The military judge found the appellant's statements of 19 October 1982 were voluntary. He specifically found that:

1. the accused was properly advised of his rights under Article 31, Uniform Code of Military Justice (U.C.M.J.), 10 U.S.C. § 831;

2. there was no evidence that the accused failed to understand his rights or the offenses under investigation;

3. the agents conducting the interview did not use force, threats, promises, or deception;

4. although the interview was long, there were breaks in the interrogation;

5. the interview was purposely scheduled during the accused's normal duty hours so as to avoid confronting him when he was tired;

6. there was no evidence the appellant was inordinately tired or fatigued and, as a result, unable to understand the consequences of his actions;

7. the interview was relaxed and friendly;

8. the accused was a high school graduate and an NCO of some experience and length of service;

9. the appellant did not enter a self-induced trance during the interrogation; and

10. hypnosis had no impact on the statement.

In addition to the trial court's findings of fact we note that the appellant left the session with a handshake and stated an intention to return the next day.

Appellant's counsel have urged us to consider the totality of the circumstances leading to the October statements. They have argued that the April and October interviews were "one continuous process" in which the government eroded the accused's will to remain silent. They cite *Leyra v. Denno,* 347 U.S. at 561, 74 S.Ct. at 719. The evidence, however, proved otherwise.

On 16 April, eleven days before the first efforts to hypnotize the appellant, the appellant voluntarily contacted the OSI and told them that he had observed suspicious movements in the service call room as he drove past it on the night of the murder. His first, non-hypnotic, statements included assertions about the assailant's possible identity and descriptions of the assailant's height, weight, hair color and clothing. They also included a description of the parking lot and the cars parked there. During the two hypnotic sessions the appellant maintained his premise that he had only driven past the crime scene. Those

present at the two hypnotic interviews treated the appellant as the witness he purported to be. The video tapes of the interviews reflect no efforts to overbear the appellant's will. The interviewers did not suggest that the appellant's statements were untrue, nor did they suggest that the appellant had entered the building or was culpably involved in the crime. Between April and October the appellant freely, and often without invitation, made many statements to the OSI and others in which he described what he purportedly saw as he drove past building 520 and suggested who the perpetrator might be. The evidence shows that the agents advised the appellant of his rights on 19 October and that, without persuasion of any sort, he waived his rights and agreed yet again to talk about the case.

The evidence consistently showed that the appellant voluntarily, and sometimes eagerly, sought to discuss the case with others including law enforcement authorities both before and after the hypnotic interviews. There was no evidence tending to confirm or illustrate Doctor Orne's theory that, between April and October, the hypnotic interviews, either directly or indirectly, caused the appellant to confabulate a false belief that he had entered the building. In fact, the appellant maintained his claim that he had only driven past the scene well into the 19 October interview. Thus, even if we assumed the April interviews violated the appellant's constitutional rights, the appellant's own repeated and uninvited efforts to talk about the case were wholly independent acts which effectively dissipated any arguable taint. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see United States v. Collier*, 1 M.J. 358, 361 (C.M.A. 1976). The evidence fully supports the military judge's finding that the efforts to hypnotize the appellant had no impact on his October statements. We specifically find that the April interviews had no impact on the appellant's decision to waive his rights nearly six months later and did not psychologically induce or coerce the appel-

lant's final description of his actions at the crime scene. *Cf. Leyra v. Denno, supra.*

Finally, the record indicates the appellant was first advised of his Article 31, U.C. M.J., and *Miranda* rights on 24 April 1982 and that, although he had several subsequent discussions with OSI agents, he was not again advised of his rights until 19 October. The advice of rights on 24 April was mentioned only casually by one witness and was not probed by either party. Although trial defense counsel moved to suppress the statements made on 19 October, they premised their motion on the alleged effects of hypnosis, the allegedly coercive techniques attending the October interrogation, and the alleged lack of corroboration. They did not move to suppress the October statements as derivative of earlier statements unlawfully taken without advice of rights. Consequently, neither party developed the evidence or argued about whether the OSI agents advised the appellant of his rights at the other interviews or whether they were required to do so. We find that the issue of whether the October statements were derivative of earlier unlawful failures to advise the appellant of his rights was neither raised at trial nor preserved for appeal. Mil.R.Evid. 304(d)(2)(A), 304(e), 103(a)(1); and S. Saltzburg, L. Schinasi, and D. Schlueter, Military Rules of Evidence Manual, 79–80 (1981). Given the evidence before us, we find no plain error.

Having considered all the evidence, we find no error in the military judge's ruling regarding voluntariness. *United States v. Carmichael*, 21 U.S.C.M.A. 530, 45 C.M.R. 304 (1972); Mil.R.Evid. 304(c)(3); *see Stein v. New York*, 346 U.S. 156, 184–186, 73 S.Ct. 1077, 1092–1093, 97 L.Ed. 1522 (1953); *cf. Darwin v. Connecticut*, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Leyra v. Denno, supra;* and *United States v. O'Such*, 16 U.S.C.M.A. 537, 37 C.M.R. 157 (1967).

### G. *Corroboration*

 Military Rule of Evidence 304(g)(1) states that independent evidence is corroborative if it raises "an inference of the truth of essential facts admitted." *United States v. Baran*, 19 M.J. 595 (A.F.C.M.R. 1984), *pet. granted*, 20 M.J. 143; *United States v. Poduszczak*, 20 M.J. 627 (A.C.M. R.1985); S. Saltzburg, L. Schinasi, and D. Schlueter, Military Rules of Evidence Manual, 81 (1981). We find that the government presented more than enough evidence to raise an inference of the truth of the essential facts in the appellant's October statements.

The military judge found that the appellant's statements included two essential facts: first, that the appellant was in building 520 when the crime occurred, and, second, that he had intercourse with the victim while he was there. The appellant's admission that he was present included a detailed description of the victim's wounds and the crime scene. The military judge found that the government's proof corroborated the appellant's description of the victim's wounds, his description of the trail of blood in the hallway, his statement that he tidied the service call room, and his description of the position of the victim's body in the career advisor's office. He found further that the appellant's admission of intercourse was corroborated by the laboratory evidence correlating the appellant's blood type with the chemistry of the semen found in the victim's pubic hairs.

In addition to the trial court's findings, we note that the appellant described the trail of blood as being like that made when a deer is dragged by its hind quarters. He also described a hesitation spot in the bloody trail in front of the career advisor's office. These statements were corroborated by independent evidence showing the existence of a hesitation spot and showing that the victim was most likely dragged down the hall by her feet. In addition, the evidence corroborated the appellant's statements that the intercourse occurred in the career advisor's office, that there was a pool of blood beside the victim's head, and that the victim remained clothed above the waist. The sufficiency and persuasiveness of the corroborating evidence were enhanced by evidence showing that the detailed information about the crime and crime scene provided in the appellant's statements was not generally known in the community. Thus, the government's proof amply corroborated the appellant's admissions that he was present during the assault of the victim and that he had intercourse with her at that time. We, therefore, find that the military judge was correct when he concluded the statements were adequately corroborated and when he denied appellant's motion to suppress.

### III.

Having examined the record of trial, the assignment of errors, the government's reply thereto, and having considered the oral arguments of both parties, we have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and sentence are

### AFFIRMED

SESSOMS and CANELLOS, Senior Judges, concur.