UNITED STATES, Appellee,

v.

Greg S. THATCHER, Private, U.S. Marine Corps, Appellant.

No. 54,734.

NMCM 853448.

U.S. Court of Military Appeals.

Feb. 28, 1989.

For Appellant: *Lieutenant Colonel Richard E. Ouellette,* USMC (argued).

For Appellee: *Captain Thomas D. Miller,* USMC (argued); *Captain Wendell A. Kjos,* JAGC, USN and *Lieutenant Larry D'Orazio,* JAGC, USNR (on brief); *Captain Carl H. Horst,* JAGC, USN and *Lieutenant Robert G. Sosnowski,* JAGC, USNR.

*Opinion of the Court*

EVERETT, Chief Judge:

In this appeal from a special court-mar-

tial conviction for larceny,[1] appellant argues that the military judge erred in denying a defense motion to suppress as evidence the pilfered items which had been seized during an alleged "health-and-comfort" inspection pursuant to Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984. Specifically, appellant urges that the "inspection" was a subterfuge to search for criminal evidence without probable cause. We agree.

## I

One Monday morning in January 1985, Corporal Cerullo, the Company Police Sergeant, discovered missing from the police shed "a gray metal tool box containing assorted tools, ... a green Army first-aid kit, containing his own assorted tools, and a green metal trunk (with a "The Who" sticker on the side)." 21 M.J. 909. All of these items had been in the shed the previous Friday, but none had been logged out. After Cerullo unsuccessfully had searched the barracks' common areas, he reported the incident to Gunnery Sergeant McKay. Major Talbott, the company commander, joined the conversation, and both McKay's and Talbott's initial reaction was that the property probably had been misplaced. Further search of the police shed and the surrounding area, however, proved fruitless.

Noting that, previously, property had been removed from the police shed without being logged out properly, Talbott surmised that possibly one of the persons assigned to a working party that had been in the area the week before had checked out the property and had left it in a working area or in his room. The Court of Military Review found factually that, at this point, Talbott "had no knowledge ... whether the property had been stolen." *Id.* at 910.

However, when Talbott was advised that Thatcher had been a member of the working party, he grimaced. Cerullo testified:

I went down the list and I told him that we'd had Private Thatcher. You know, he looked at me like—like, you know, he'd been in a lot of trouble before. You know, the Major knows that he's been caught—not caught, but he's been—well, he has been caught but not charged with taking things.

As Talbott himself later testified, "It just seems like whenever something negative happens around the company, Private Thatcher's name is involved."

Talbott instructed Cerullo to check the possibility of a mixup with another marine, who he knew owned a trunk similar to the missing one. He also instructed McKay and Cerullo "to track these people down" who had been in the working party and "to look in their rooms to see if the tool boxes were in their rooms." As McKay put it, Talbott had "informed Corporal Cerullo and I to find out who was on the working party that week, and to go over into their rooms and search for the tools." McKay testified that "Cerullo relayed back to" him that "First Sergeant Poffenroth [had] stat[ed] something about 'Go over to Thatcher's room. He's been caught stealing before.' "

At this point, it should be noted that, for the preceding 8 months, there had been a routine of conducting daily health-and-comfort inspections of this unit to check for cleanliness and to ensure that all pilferable items were secured in wall lockers. Usually, such inspections were done in the morning, but occasionally they were held during the lunch hour. All rooms were inspected, whether locked or unlocked and whether the occupants were present or away. During the inspections, McKay was not authorized to open or to break into secured wall lockers. Only if a wall locker was un-

---

1.  Despite Thatcher's pleas of not guilty, he was convicted of stealing various items in total value "in excess of $100.00," in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. Therefor, he was sentenced to a bad-conduct discharge, confinement for 4 months, and forfeiture of $400.00 pay per month for 4 months. The convening authority approved these results, and the Court of Military Review affirmed. 21 MJ 909 (1986).

locked was he to enter it—and then only to identify to whom it belonged.

Talbott indicated at trial that he had intended his check of the working party personnel's rooms for the tools to be part of that day's health-and-comfort inspection. However, he conceded that he never formally advised McKay to conduct this check in connection with the daily inspection.

So, as Sherlock Holmes might have said, the game was afoot. Passing by a head (latrine) and another person's room, McKay and Cerullo went directly to Thatcher's room, where they knocked on the closed door. Before receiving a response, however, they entered the room and found Thatcher standing next to his open wall locker, packing the locker's contents into his open seabag in anticipation of his scheduled discharge the next day. While "inspecting" the room, McKay advised Thatcher that he was looking for the missing tools.

At this point, Cerullo spotted a green metal trunk with a "The Who" sticker on its side inside the open wall locker. After Cerullo had advised McKay of his discovery, McKay directed Thatcher to remove the trunk and to remove the trunk's contents. Inside, McKay discovered the gray metal tool box and tools and the green Army first-aid kit and tools that they were looking for.

Later that same day, in the afternoon, the health-and-comfort inspection was conducted of the remainder of the barracks.

## II

### A

■ It is time-honored precedent of this Court that a servicemember possesses a Fourth–Amendment right to protection against unreasonable searches and seizures. As was stated in the lead opinion [2] in *United States v. Stuckey*, 10 MJ 347, 349 (CMA 1981) (Everett, C.J.):

The time is long past when scholars disputed the applicability of the Bill of Rights to service personnel. Instead, our premise must be "that the Bill of Rights applies with full force to men and women in the military service unless any given protection is, expressly or by necessary implication, inapplicable" and, therefore, that the Fourth Amendment does shield the American serviceperson. *United States v. Middleton*, 10 MJ 123, 126 (CMA 1981) (footnote omitted); *United States v. Ezell*, [6 MJ 307] at 313 [CMA 1979]; *United States v. Hartsook*, 15 USCMA 291, 35 CMR 263 (1965).

(Footnote omitted.)

■ Of course, it is only *unreasonable* searches and seizures against which a servicemember—or a civilian—is protected by the Fourth Amendment. What is unreasonable depends substantially on the circumstances of the intrusion; and this Court has recognized that, in some instances, an intrusion that might be unreasonable in a civilian context not only is reasonable but is necessary in a military context.

Thus, we long have recognized that unit inspections are necessary and legitimate exercises of command responsibility. *See, e.g., United States v. Gebhart*, 10 USMCA 606, 610 n. 2, 28 CMR 172, 176 n. 2 (1959). *Accord United States v. Middleton*, 10 MJ 123 (CMA 1981). However, we steadfastly have admonished that any "inspection" which is, in reality, a subterfuge for a traditional search for evidence of crime will be seen for what it is; and, if conducted without probable cause or in an unreasonable manner, will be condemned. *See, e.g., United States v. Lange*, 15 USCMA 486, 35 CMR 458 (1965). Moreover, we have insisted that persons conducting military "inspections must be ever faithful to the bounds of a given inspection, in terms both of area and purpose." *United States v. Brown*, 12 MJ 420, 423 (CMA 1982).

When the Manual for Courts–Martial, United States, 1951, mentioned searches "made in accordance with military custom"

---

**2.** Judge Fletcher's opinion concurring in the result, 10 MJ 347, at 365–66, reflects agreement

with the excerpt quoted from the lead opinion, *infra*.

(see para. 152), it undoubtedly contemplated the health-and-welfare inspections traditional in all the armed services. *See United States v. Middleton, supra* at 127. The Manual for Courts–Martial, United States, 1969 (Revised edition), stated that the restriction which limits the objects of a search "does not apply to administrative inspections or inventories conducted in accordance with law, regulation, or custom" (para. 152). Once again administrative inspections—which, under many names, always have been conducted in the military establishment—were intended to be included in this reference. *See United States v. Middleton, supra* at 127.

When the President promulgated the Military Rules of Evidence in 1980, he decided to be more explicit in the treatment of "[i]nspections and inventories in the armed forces." *See* Mil.R.Evid. 313, 1969 Manual, *supra*. This rule allowed an inspection to be "conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle" being examined. According to the rule as it then existed, an "inspection" includes "an examination to locate and confiscate unlawful weapons and other contraband"—if certain conditions were met.

Subsequently, Mil.R.Evid. 313(b) was amended by the President; and, among other things, it now states:

> An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband.... An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule.

1984 Manual, *supra*.

In *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), the Supreme Court reaffirmed that administrative inspections are within the purview of the Fourth Amendment and that, to be constitutional, the inspections must meet several criteria. Mil.R.Evid. 313(b) passes constitutional muster under *Burger*, because it restricts the scope of administrative inspections to reasonable bounds. *See United States v. Flowers,* 26 MJ 463, 466 (CMA 1988) (Everett, C.J., concurring in the result). However, appellant claims that in his case those bounds were ignored, because the intrusion into his room was not really an "inspection" but instead was a classic search for evidence of a crime.

### B

■ Preliminarily, however, the Government seeks to forestall any consideration of appellant's claim by contending that Thatcher lacks standing to complain of the intrusion. The Government's argument is that, because his room was subject to a daily health-and-comfort inspection, Thatcher lacked any "legitimate expectation of privacy" therein against intrusion by command. *See United States v. Muniz,* 23 MJ 201, 204 (CMA 1987); *United States v. Wisniewski,* 21 MJ 370, 372 (CMA), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986).

To the extent this theory implies that a commander's daily routine of inspecting the rooms of his subordinates automatically cancels any reasonable expectation of privacy by them with respect to their rooms, we reject the notion. The circumstance that one is subject to a lawful inspection does not preclude him from complaining about an inspection which violates the requirements imposed by the President. *Cf. United States v. Brown,* 12 MJ at 423.

To accept the Government's argument would obliterate servicemembers' Fourth Amendment rights with respect to their rooms and their property; and in so doing, we would be overruling our established precedents recognizing those rights. In short, if an intrusion on privacy is really an "inspection" and complies with Mil.R.Evid. 313, no reasonable expectation of privacy has been violated; but if the purported inspection is only a subterfuge for a search or is not properly conducted, then a violation has occurred.[3]

### C

■ In ruling on the defense motion to suppress evidence seized as a result of the entry into appellant's room, the military judge initially considered what burden of proof would apply. He found that

> the purpose of the examination of the accused's room was to locate contraband; specifically, missing tools, toolboxes, et cetera which Gunnery Sergeant McKay and the company commander were aware of early in the morning of 28 January 1985. Moreover, a specific individual was selected for examination; that is, the accused, as his name had been mentioned by Corporal Cerullo to the CO and also mentioned by the first sergeant.

Consequently, he concluded that the Government should be "held to the burden of proving by clear and convincing evidence that this was an inspection."[4]

It has been suggested that the Government should not have been required to shoulder so heavy a burden, because the stolen property was not "contraband" within the meaning of Mil.R.Evid. 313(b). We reject this suggestion, for we are convinced that the term "contraband," as used in Mil.R.Evid. 313(b), was intended to include stolen property. According to *Black's Law Dictionary* 291 (5th ed. 1979), "contraband" means "any property which is unlawful to ... possess. Goods exported from or imported into a country against its laws."

We doubt that the President intended for the term "contraband" to be limited to the meaning it has in connection with customs laws—items whose importation or exportation is forbidden. Instead, we believe that it includes all items which are not lawfully possessed. Under this interpretation, stolen property is "contraband" because the possessor is not entitled to retain possession of such property.

A broad interpretation of "contraband" conforms to the obvious purpose of Mil.R. Evid. 313(b) to ensure that "inspections" are not used as "subterfuge[s for] searches." *See* Drafters' Analysis to Mil. R.Evid. 313(b), 1984 Manual, *supra* at A22–17 to A22–20. This danger is as great in the present case—where stolen property is involved—as it would be if the more typical "contraband," like drugs, were involved. Therefore, it is unlikely that the President would have intended for a lower standard of proof to apply here.

### D

■ Although the military judge conducted a meticulous inquiry and applied the

---

**3.** As noted earlier, what is reasonable depends upon the circumstances of the intrusion. As we recognized in *United States v. Middleton,* 10 MJ 123, 128 n.8 (CMA 1981), "The armed services have made increasing efforts to provide privacy for service members in their dormitories and barracks." This transition from open bays to semi-private rooms evolved largely to make military life more palatable and, accordingly, more attractive to potential recruits. There is a much greater expectation of privacy in such a lifestyle than there is in large bays holding large numbers of individuals and having no walls or barriers between bunks and lockers. While there still is no reasonable expectation of privacy from all intrusions where command responsibil-

ity dictates otherwise, in other circumstances substantial expectations do arise from these living conditions.

**4.** The military judge also ruled on the Government's contention that, if the inspection were illegal, the stolen property would nonetheless have been inevitably discovered. *United States v. Kozak,* 12 MJ 389 (CMA 1982); *see Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). In this instance he properly utilized a preponderance-of-the-evidence burden of proof, as authorized by *Kozak.* Applying this standard, he ruled against the Government on the inevitable-discovery issue.

correct standard of proof, we disagree with his conclusion that the Government established by the requisite "clear and convincing" evidence that the intrusion into Thatcher's room was a lawful military inspection under Mil.R.Evid. 313, rather than a prohibited criminal search without probable cause.

In the first place, Thatcher was the prime suspect with respect to the possible theft of the tools and boxes. He was awaiting imminent discharge from the Marine Corps, and he had been in the working party so he might have had an opportunity to steal the property. He was thought by his commander and others to have stolen things before, even though for some reason he had never been charged therewith. Indeed, Thatcher's reputation was such that Major Talbott, his commander, "grimaced" when he learned that Thatcher had been in the working party. Talbott knew that Thatcher always was involved somehow in any trouble in the unit.[5]

Although the barracks was inspected daily, on this occasion McKay and Cerullo passed by the head and another room and went straight to Thatcher's room. Moreover, after the stolen property had been seized in Thatcher's room in the morning, no further examination of the barracks took place until that afternoon. Thus, it appears that when McKay and Cerullo went to the barracks, they had in mind not the routine daily inspection (which could have included looking for the missing items, if done in a neutral fashion) but instead a search of the suspect's quarters. This inference is supported by this testimony of Gunnery Sergeant McKay on direct examination:

Q. Exactly what was it the commanding officer told you that morning?

A. The commanding officer told Corporal Cerullo and myself, sir, to find out who was on the working parties and go over and search their rooms for the possible tools that were missing.

Furthermore, although both McKay and Cerullo gave detailed statements to the Naval Investigative Service (NIS) on the day after the stolen property was recovered, neither of those statements made any reference to an "inspection" or gave any indication that Cerullo and McKay were making an inspection rather than a search. According to McKay's testimony, he first mentioned an "inspection" in a conversation with trial counsel or defense counsel a few days before trial—and some 2 months after his earlier statement.

Thus, it appears that the sequence of events on January 28, 1985 was this: Initially Cerullo thought some items of property in the shed had been misplaced; so he examined the shed and common areas. After this effort proved unsuccessful, he proceeded on the hypothesis that a member of the working party had inadvertently taken the tools, without any intent to steal them, and that the members of the working party should be approached and asked about this possibility. At this point, however, the incident took on a different flavor: Thatcher was identified as a member of the working party, and because of his poor record in the unit and his impending discharge, suspicion developed that he had stolen the property. When this possibility was discussed with Major Talbott, the unit commander, he told McKay and Cerullo to go search for the missing tools. They went directly to the most likely suspect—Thatcher—and bypassed other areas of the barracks that would have been examined during the routine daily barracks inspection. When that examination proved fruitful, the exercise ceased; and the routine inspection of the barracks occurred later that day.

This evidence is not "clear and convincing," as required by Mil.R.Evid. 313(b); thus the Government has failed to establish that the incriminating evidence was found

---

5. During the hearing on the motion to suppress, there was also a reference to Thatcher's incarceration by civilian authorities at some time not long before the alleged theft occurred. Also, it seems clear from other testimony that at one time he had been a corporal and thereafter had been reduced to private—presumably through nonjudicial punishment for misconduct.

as the result of a lawful inspection. Instead, that evidence is inadmissible because it was the product of an unlawful intrusion into Thatcher's room.

### III

The decision of the United States Navy–Marine Corps Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Judge SULLIVAN concurs.

COX, Judge (dissenting):

Based upon the information available to the commander, I believe the authorization to inspect or search appellant and his area in the barracks was responsible command conduct and reasonable under the Fourth Amendment to the Constitution, taking into consideration the military context in which the events occurred. *United States v. Morris*, 28 MJ 8, 14 (CMA 1989) (Cox, J., concurring in part and dissenting in part). Therefore, I would not apply the exclusionary rule to the contraband seized and would sustain the judge's and the Court of Military Review's rulings that the evidence was admissible.