**UNITED STATES, Appellee**

v.

**Keith T. TAYLOR, Staff Sergeant U.S. Marine Corps, Appellant.**

Nos. 93–0595.
CMR No. 91 0669.

U.S. Court of Military Appeals.

Argued March 16, 1994.

Decided Sept. 30, 1994.

Certiorari Denied Feb. 21, 1995.

See 115 S.Ct. 1108.

For Appellant: *Lieutenant David P. Sheldon*, JAGC, USNR (argued).

For Appellee: *Lieutenant J.L. Epperson*, JAGC, USNR (argued); *Colonel T.G. Hess*, USMC, *Commander S.A. Stallings*, JAGC, USN, and *Captain Brett D. Barkey*, USMC (on brief).

*Opinion of the Court*

CRAWFORD, Judge.

Contrary to his pleas, appellant was convicted of wrongful use of marijuana, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The convening authority approved the sentence of a bad-conduct discharge, 45 days' hard labor without confinement,[1] and reduction to the lowest enlisted grade. The Court of Military Review affirmed the findings and sentence in an unpublished opinion. We granted review on the following issue:

> WHETHER APPELLANT'S COMMAND CONDUCTED A SUBTERFUGE SEARCH WHEN SEIZING APPELLANT'S URINE WHICH WAS PURPORTEDLY SEIZED PURSUANT TO AN INSPECTION.

We hold that appellant's command complied with Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984, and did not conduct a subterfuge search in directing a urinalysis examination which resulted in seizure of appellant's urine.

### FACTS

Appellant was an administrator in the S–1 section of the 5th Marine Regiment, 1st Marine Division, Camp Pendelton, California. On December 7, 1989, he had three wisdom teeth removed and was placed on 24–hours of bed rest. The commissioned officer in charge of the S–1 section was Captain (Capt.) Jackson. The Marines of the S–1 section fell

---

1. The court below erroneously stated this as confinement. Unpub. op. at 1.

under the command of Capt. Lindsay, the headquarters company commander of the 5th Marine Regiment.

On the same date that appellant had his teeth pulled, Sergeant (Sgt.) Ramon, the Regimental Substance Abuse Control Officer (SACO), received an anonymous telephone message on his answering machine that someone in the S–1 section had been using drugs.

On the following day, Friday, December 8, 1989, Capt. Lindsay made a decision to order a random urinalysis test the following week. Capt. Lindsay was not aware of the anonymous tip received by Sgt. Ramon. Capt. Lindsay told his executive officer to tell Sgt. Ramon about his decision to order the random urinalysis.

Capt. Lindsay had several responsible and legitimate reasons for ordering a urinalysis inspection. First, Sgt. Ramon, an experienced SACO, was scheduled to separate from the service, and Capt. Lindsay wanted to conduct the inspection prior to his separation. Second, with the Christmas holiday season approaching, Capt. Lindsay wanted to deter use of drugs in his command. And finally, he wanted to comply with Marine Corps directives requiring urinalysis testing.

Capt. Lindsay had only a limited number of vials and had not yet decided how to select the section to be tested. He discussed the options with Sgt. Ramon. Sometime that same day Sgt. Ramon told Capt. Jackson about the anonymous call he had received about drug use by someone in the S–1 section.

On Monday, December 11, 1989, Sgt. Ramon told Capt. Jackson that a former member of the S–1 section had reported to him that appellant was a drug user. Thereafter, the Court of Military Review found:

> Captain Jackson called Captain Lindsay and asked when Captain Lindsay planned on doing urinalysis testing. Captain Lindsay replied, "Well, this week." Captain Jackson responded, "How do you plan to do it?" After Captain Lindsay replied, "It's going to be random," Captain Jackson stated, "Well, what about the S–1 section?" Captain Lindsay then said, "Fine, that fits right along, and why not just go ahead and get it out of the way." (R. 46). During the conversation, Captain Jackson did *not* tell Captain Lindsay about information he had received from Sergeant Ramon....

Unpub. op. at 2–3.

Capt. Lindsay testified that no one had ever volunteered a section before. With his suspicion perhaps raised, Capt. Lindsay asked Sgt. Ramon, "Is there anything special going on in the S–1 shop that I should know about?" Ramon replied to the effect of, "Not at this time." After this conversation on Monday, December 11, Capt. Lindsay then directed that the SACO conduct a urinalysis sweep of the S–1 section the next day.

That same Monday afternoon, appellant's noncommissioned officer told him to go home because his face was swollen and he was not feeling well. Since his pain persisted, at 8:00 p.m. appellant went to the dental clinic and was given a pain killer and a "no duty" chit which excused him from duty until 8:00 a.m., Wednesday, December 13, 1989.

On Tuesday, December 12, 1989, appellant remained at home based on his excusal from work because of the "no duty" chit. During the early afternoon Sgt. Ramon told Capt. Jackson that he had received another report that appellant had smoked marijuana earlier with a female friend and had requested "Gold Seals," supposedly a diuretic to conceal drugs in the urine. At approximately 3:00 p.m. Capt. Jackson, not being sure whether appellant had a "no duty" chit, told appellant's NCOs to have appellant come to work. Appellant did. At this time he was told to provide the urine specimen that formed the basis of his conviction.

## DISCUSSION

As we stated in *United States v. Lopez*, 35 MJ 35, 39 (CMA 1992):

> The military, like the Federal and state systems, has hierarchical sources of rights. These sources are the Constitution of the United States; Federal Statutes, including the Uniform Code of Military Justice; Executive Orders containing the Military Rules of Evidence; Department of De-

fense Directives; service directives; and Federal common law. Unlike the Federal Rules of Evidence, Section III of the Military Rules of Evidence "codifies" the constitutional rules. Normal rules of statutory construction provide that the highest source authority will be paramount, unless a lower source creates rules that are constitutional and provide greater rights for the individual; for example, Mil.R.Evid. 305(e) as to notice to counsel, or Article 31, UCMJ, 10 USC § 831, requiring warnings to suspects not in custody.

The paramount source is the U.S. Constitution. The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The next applicable source is the Uniform Code of Military Justice: Articles 1–146, 10 USC §§ 801–946. Pursuant to Article 36(a), UCMJ, 10 USC § 836(a), the President has promulgated Rules of Evidence. Mil.R.Evid. 311(a) sets forth the modern understanding of the Fourth Amendment by stating that "[e]vidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against" a person with standing to challenge its admissibility.

Mil.R.Evid. 311 through 317, like the decisions of the Supreme Court, divide Fourth Amendment issues between coverage (that is, when the Fourth Amendment is applicable) and protections. Mil.R.Evid. 314(d) provides

that "[g]overnment property may be searched . . . unless the person to whom the property is issued or assigned has a reasonable expectation of privacy therein at the time of the search." *See also United States v. Wooten*, 34 MJ 141 (CMA 1992) (no expectation of privacy in bank records); *United States v. Parrillo*, 34 MJ 112 (CMA 1992) (overheard telephone call not a search); *United States v. Schmitt*, 33 MJ 24 (CMA 1991) (automobile may have been abandoned); *United States v. Britton*, 33 MJ 238 (CMA 1991) (no expectation of privacy in another's locker even though not used for 5 months; *see United States v. Thatcher*, 28 MJ 20, 23 (CMA 1989).

We have discussed the privacy interest in numerous cases before this Court. *See United States v. McCarthy*, 38 MJ 398 (CMA 1993); *United States v. Middleton*, 10 MJ 123 (CMA 1981). As we indicated in *Middleton*:

> In considering what expectations of privacy a servicemember may reasonably entertain concerning military inspections, we must recognize that such inspections are time-honored and go back to the earliest days of the organized militia.

10 MJ at 127.

In *McCarthy* we stated:

> We need not determine the outer limits of appellant's "reasonable" expectation of privacy. Suffice it to say that he could not reasonably expect to avoid apprehension in this case by retreating to his room.

38 MJ at 403.

We also indicated in *Lopez* that "the Supreme Court has never expressly applied the Bill of Rights to the military, but has assumed they applied." [2] 35 MJ at 41.

---

**2.** As the Court stated in *Davis v. United States*, —— U.S. ——, ——, n. *, 114 S.Ct. 2350, 2354, n. *, 129 L.Ed.2d 362 (1994):

We have never had occasion to consider whether the Fifth Amendment privilege against self incrimination, or the attendant right to counsel during custodial interrogation, applies of its own force to the military, and we need not do so here. The President, exercising his authority to prescribe procedures for military criminal proceedings, see Art. 36(a), UCMJ, 10

U.S.C. § 836(a), has decreed that statements obtained in violation of the Self–Incrimination Clause are generally not admissible at trials by court-martial. Mil. Rules Evid. 304(a) and (c)(3). Because the Court of Military Appeals has held that our cases construing the Fifth Amendment right to counsel apply to military interrogations and control the admissibility of evidence at trials by court-martial, *see, e.g., United States v. McLaren*, 38 MJ 112, 115 (1993); *United States v. Applewhite*, 23 MJ 196,

This is not only of academic importance, but also it is important to the President in deciding what rules should be applied to the military.[3] Because of the "special needs" in the military, *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 628, 109 S.Ct. 1402, 1419, 103 L.Ed.2d 639 (1989) (case for testing without individualized suspicion is "compelling"); *cf. New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (inspection based upon a reasonable suspicion is appropriate), the Fourth Amendment may not apply in total. *See United States v. McCarthy, supra.* Judge Cox's view concerning the reasonable commander and the reasonableness clause of the Fourth Amendment may apply. That view is as follows:

> The Fourth Amendment only protects military members against unreasonable searches within the context of the military society. Something as drastic as a "shakedown inspection" can only be justified in the military because of the overriding need to maintain an effective force. Likewise, preemptive strikes on drugs and other dangers can only be reasonable because of their impact on the mission. The United States Court of Military Appeals has the obligation to ensure that inspections, searches, and seizures in the military society are reasonable in their inception and in their conduct. This means that commanders must have rules which are honest, simple, forthright, and easy for both the commander and the commanded to understand.

198 (1987), and the parties do not contest this point, we proceed on the assumption that our precedents apply to courts-martial just as they apply to state and federal criminal prosecutions.

3. The discussion concerning application of the Fourth Amendment is more than an academic discussion. It relates directly to the bright-line rules set forth in Section III of the Military Rules of Evidence, Manual for Courts–Martial, United States, 1984. While these rules are helpful for commanders, promulgating the rules can be a very tedious process, taking sometimes up to 4 years to promulgate a rule. Draft Mil.R.Evid. 305(e), which seeks to conform military practice to *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), and *McNeil v.*

*United States v. Lopez*, 35 MJ at 45 (citations omitted) (Cox, J., concurring with modest reservations).

Unless there are changes to the Rules, we are bound by Mil.R.Evid. 313(b), which provides in part:

> An "inspection" is an examination of the whole or part of a unit ... to determine and to ensure the security, military fitness, or good order and discipline of the unit.... An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule.
>
> If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, ... and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule.

In *United States v. Bickel*, 30 MJ 277 (CMA 1990), we upheld the constitutionality of this provision.

But Mil.R.Evid. 313(b), which makes a distinction between administrative inspections and inspections for prosecutorial purposes, is

*Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), has not been approved as of yet. Judge Cox has emphasized his concern about the rules in *United States v. Lopez*, 35 MJ 35, 42 (CMA 1992)(Cox, J., concurring with modest reservations), and *United States v. Alexander*, 34 MJ 121, 127 (CMA 1992)(Cox, J., concurring in the result). Finally, this Court in *United States v. Middleton*, 10 MJ 123 (CMA 1981), while recognizing Mil.R.Evid. 313(b), did not set forth why the rule was promulgated and the impact of *Middleton* on the prior cases—*United States v. Roberts*, 2 MJ 31 (CMA 1976), and *United States v. Thomas*, 1 MJ 397 (CMA 1976). *See also* Lederer and Borch, *Does the Fourth Amendment Apply to the Armed Forces?*, 3 William and Mary Bill of Rights J. 219 (Summer 1994).

probably more restrictive than it need be. *See e.g., Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); ·*Skinner v. Railway Labor Executives Ass'n, supra. Cf. Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *New Jersey v. T.L.O., supra.*

■ The threshold question in this case is whether Capt. Lindsay's decision to order a urinalysis examination was a subterfuge search for contraband rather than a lawful inspection. Our principal focus is on the role of Capt. Lindsay. He decided to order a random urinalysis of his unit because he knew that the unit's experienced SACO was scheduled to separate from the service; he wanted to deter drug use during the Christmas holidays; and he wanted to comply with Marine Corps policy and directives requiring urinalysis testing. When Capt. Lindsay made his decision to conduct the urinalysis examination, there had not been a "report of a specific offense in the unit." There were no "specific individuals ... selected for examination" or "substantially different intrusions" made a part of this urinalysis testing. Further, an inspection may include examination of a "whole or part of a unit." Thus, we conclude that Capt. Lindsay's decision to order a urinalysis examination was a legitimate action to conduct a lawful inspection in compliance with Mil.R.Evid. 313(b).

We are mindful that Sgt. Ramon and Capt. Jackson had received information linking appellant to drug use. However, there is no evidence that either of them conveyed this information to Capt. Lindsay. At the time of Jackson's phone call to Lindsay during which he volunteered the S–1 section for testing, Jackson was in receipt of two pieces of information. First, he was aware that Sgt. Ramon had received an anonymous tip that someone in the S–1 section had used drugs. And second, he was also aware that Sgt. Ramon had thereafter received an allegation that appellant was a drug user. We need not answer the question whether these two pieces of information constitute "a report of a specific offense in the unit." There is no indication that either of these allegations were known to Capt. Lindsay. Further, Capt. Lindsay's decision to accept Capt. Jackson's suggestion to test the S–1 section followed Lindsay's legitimate decision to conduct a urinalysis inspection. While Capt. Lindsay testified he pinpointed the S–1 section after he talked to Capt. Jackson, the primary purpose of ordering the inspection was to "deter and to disencourage personnel from using ... drugs." There is no indication of a so-called "wink and a nod" (*see* 41 MJ at 175 (Wiss, J., dissenting)) between Capt. Lindsay, Capt. Jackson, and Sgt. Ramon to create a pretext for an inspection. And finally, we will not impute the knowledge of either Capt. Jackson or Sgt. Ramon to Capt. Lindsay. In conclusion, we hold that, under the facts of this case, there was a proper inspection of part of a unit by a commander and, therefore, the evidence obtained through that inspection is admissible.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judges COX and GIERKE concur.

SULLIVAN, Chief Judge (dissenting):

### A

The granted issue in this case is:

WHETHER APPELLANT'S COMMAND CONDUCTED A SUBTERFUGE SEARCH WHEN SEIZING APPELLANT'S URINE WHICH WAS PURPORTEDLY SEIZED PURSUANT TO AN INSPECTION.

An initial question arises from the majority opinion concerning its legal basis (or lack thereof) for deciding this issue. Appellant argues that subterfuge searches are prohibited by Mil.R.Evid. 313, Manual for Courts–Martial, United States, 1984, and our case law, and their fruits are inadmissible at courts-martial. *See* Mil.R.Evid. 311 and 315; *United States v. Johnston,* 24 MJ 271 (CMA 1987). In addition, I note that administrative inspections which are mere pretexts to search for criminal evidence are unreasonable searches for purposes of the Fourth

Amendment. *New York v. Burger,* 482 U.S. 691, 716 n. 27, 107 S.Ct. 2636, 2651 n. 27, 96 L.Ed.2d 601 (1987). Accordingly, I must disassociate myself from the majority opinion's resolution of the granted issue without reference to military or civilian case law. 41 MJ at 172.

My next concern is the factual basis of the majority opinion concerning the legitimacy of the challenged inspection. The court below commented on Captain Jackson's role both before and after the decision to inspect had been made by Capt. Lindsay, as follows:

Obviously, Captain Lindsay's decision to select the S–1 section for urinalysis testing was influenced to some extent by Captain Jackson's telephone call to him. However, that fact is not dispositive of the issue. At the time of the conversation, Captain Lindsay had already decided to conduct random testing. *All the call did was to subtlety suggest to him that he should select the S–1 for testing;* it in no way singled out the appellant for testing.

\* \* \*

In this case, the commander simply decided that an entire section would be tested. He did so without knowledge that two members of the section, Captain Jackson and Sergeant Ramon, suspected that another member of the section had illegally used drugs. *We deem it of no significance that the appellant was ordered to report to his work section from his quarters after receiving a "no duty" chit from a dental officer. In our opinion, Captain Jackson had authority to order the appellant, his subordinate, to report to work for urinalysis testing despite the appellant's receipt of a "no duty" chit from his dentist.* Additionally, we observe that Captain Jackson had investigated the appellant's situation on 12 Dec 1989 and been advised by someone at the dental clinic that appellant had not been to the dental clinic. Although not pivotal to our decision, this fact manifests to us that Captain Jackson was diligently pursuing his duties as an officer of Marines in an appropriate manner, *albeit* he received "bad scoop" from someone at the dental clinic.

At the bottom line, this is not a case where a servicemember has been unreasonably singled out for urinalysis testing by a commander who merely suspects drug use. This appellant was required to do only what was required of all Marines in his work section. . . .

Unpub. op. at 4–5 (emphasis added.) I disagree with the decision of the majority to disregard these facts as irrelevant to the granted issue.

The key question to me in this case is whether the knowledge and conduct of Capt. Jackson can be considered on the issue of whether a "subterfuge" search occurred. The majority's opinion holds that these facts are not relevant since they were not communicated to Capt. Lindsay (41 MJ at 172) and he is "our principal focus" (41 MJ at 172) under Mil.R.Evid. 313(b). Principal, however, does not mean exclusive; accordingly, I cannot join the majority's ultimate conclusion of irrelevance. Moreover, our case law and civilian case law make clear that it is necessary to consider the conduct of those executing the inspection in determining whether it was a legitimate administrative inspection or a subterfuge for a search for criminal evidence. *See United States v. Barnett,* 18 MJ 166 (CMA 1984) (mere presence of law enforcement agents who suspect appellant of crime not sufficient to turn regular inventory into subterfuge search); *United States v. Thatcher,* 28 MJ 20, 25–26 (CMA 1989) (conduct of persons conducting inspection after searching accused's spaces relevant on question of whether subterfuge search occurred); *Winters v. Board of County Commissioners,* 4 F.3d 848, 854–55 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1539, 128 L.Ed.2d 192 (1994); *United States v. Johnson,* 994 F.2d 740, 743 (10th Cir.1993). Therefore, I join Judge Wiss in concluding that the majority opinion is fatally flawed.

B

I also join Judge Wiss in his recognition and rejection of the majority's general musings on the rights of servicemembers under the Constitution, the Code, and the Manual for Courts–Martial. The general thrust of

this dicta is to raise doubt concerning the protections afforded by the Constitution to members of our armed forces and to disparage the efforts of the President in providing for the re-enforcement of these rights at courts-martial. *Contra United States v. Johnston*, 41 MJ 13, 17–18 (CMA 1994) (Sullivan, C.J., dissenting). Judicial restraint dictates that this Court refrain from such disruptive conjecture and from legal opinions suggesting that a servicemember is too generously protected under military law.

Judge Crawford has at times signaled her intent to drive a wedge between the American servicemember and his Constitutional rights. *See, e.g., United States v. Weiss*, 36 MJ 224, 234 (CMA 1992) (Crawford, J., concurring in the result) (the Appointments Clause in Article II of the Constitution does not apply to the selection of a military judiciary); *United States v. Lopez*, 35 MJ 35, 41 (CMA 1992) (There "is an implicit recognition that the Supreme Court has never expressly applied the Bill of Rights to the military, but has assumed they applied."). *Contra* Nunn, *The Fundamental Principles of The Supreme Court's Jurisprudence in Military Cases* (hereafter Nunn), 29 Wake Forest L.Rev. 557, 564 (1994), where it was stated: "Although the constitutional guarantees of the Bill of Rights are generally available to servicemembers, the application of those guarantees in the military setting differs considerably from the manner in which they apply in civilian society." Today, she, joined by a majority of this Court, signals her further dissatisfaction with Presidential rulemaking designed to protect the privacy of servicemembers.

In *Weiss v. United States*, —— U.S. ——, ——, 114 S.Ct. 752, 757, 127 L.Ed.2d 1 (1994), however, the Supreme Court squarely rejected Judge Crawford's position that military trial and appellate judges need not be appointed pursuant to the Appointments Clause of the Constitution. Moreover, in *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976), the Supreme Court expressly held that military accused "are entitled to the due process of law guaranteed by the Fifth Amendment." Then-Justice Rehnquist further commented that

the extent to which a particular Constitutional right is available to an accused is based on an "analysis of the interests of the individual and those of the regime to which he is subject." 425 U.S. at 43, 96 S.Ct. at 1291. I see nothing in *Davis v. United States*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), to the contrary, particularly with respect to the Fourth Amendment ("Because the Court of Military Appeals has held that our cases construing the Fifth Amendment right to counsel apply to military interrogations and control the admissibility of evidence at trials by court-martial, ... we proceed on the assumption that our precedents apply to courts-martial[.]" (Citations omitted.)). *Id.* at —— n. *, 114 S.Ct. at 2354 n.*.

The Supreme Court "gives particular deference to the determination of Congress" when analyzing the availability of specific Constitutional safeguards in military prosecutions and investigations. Moreover, it also provides some deference to the President in these matters. *See United States v. Mitchell*, 39 MJ 131, 136 (CMA 1994), *citing Weiss v. United States*, —— U.S. at —— – ——, 114 S.Ct. at 760–61; *Goldman v. Weinberger*, 475 U.S. 503, 507–08, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986), *cert. denied* in *Mitchell v. United States*, —— U.S. ——, 115 S.Ct. 200, —— L.Ed.2d —— (1994). Of course, this deference is not absolute. *See Schlesinger v. Councilman*, 420 U.S. 738, 758–61, 95 S.Ct. 1300, 1313–15, 43 L.Ed.2d 591 (1975). *But see Rostker v. Goldberg*, 453 U.S. 57, 68, 101 S.Ct. 2646, 2653–54, 69 L.Ed.2d 478 (1981) ("In deciding the question before us we must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch."). I for one do not join the majority's woeful lament concerning the President's authorized rule-making in this area of the law. *United States v. McCarthy*, 38 MJ 398, 404 (CMA 1992) (Sullivan, C.J., concurring in result). *See United States v. Lopez*, 35 MJ at 46, 48–49 (Sullivan, C.J., concurring in the result). *See generally* 29 Wake Forest L.Rev. at 564 and n. 27.

I only add this final thought. In America's eyes, the urinalysis program of the United States Armed Forces and its success rests on application of basic fairness for all service-members. Viewing this case with the heart of a soldier, I see basic fairness lacking. Capt. Lindsay had decided to conduct random testing. Through the manipulations of Capt. Jackson and Sergeant Ramon (members of this unit's command structure), appellant was purposefully selected to be tested. This situation is no different from one where Capt. Jackson and Sergeant Ramon preordained appellant as the one to be tested by preparing a helmet full of names for Capt. Lindsay to pick from—and the helmet was full of slips of paper all bearing appellant's name.

This was not a random or a fair inspection. Such deception and underhandedness should not be allowed in the American Armed Forces. We expect fairness for ourselves and should require no less for the American servicemember. Since Sun Tsu Wu in the fourth century B.C., leaders of successful armed forces have recognized that the right to be treated fairly has been the hallmark of a superior fighting force. Let's not give up that tradition and undermine unit cohesiveness by condoning manipulation of our system, especially when a Marine's liberty is at stake. Perhaps this Marine is guilty, but we cannot sacrifice fairness to convict him. If we do, then all innocent servicemembers are at risk in the future as a result of similar machinations of the system by those aiding a commander in conducting an inspection.

WISS, Judge (dissenting):

I

Applying Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984, and the precedent of this Court to the inspection here in issue, I disagree with the majority's reasoning and its conclusion that Captain Lindsay's order to inspect the S–1 section was permissible. The very essence of this rule is to serve legitimate military exigencies while, at the same time, preserving to the extent militarily possible the worth of individual privacy. Lindsay's search is outside of Mil.R.Evid. 313's protection for two reasons.

First, the Government did not carry its burden of persuasion that Lindsay's own motivations were untainted. The record is clear: Lindsay had decided upon a random urinalysis but had not decided which unit elements to inspect. Out of nowhere, Capt. Jackson mysteriously asks a series of beat-around-the-bush questions about Lindsay's intentions and then offers up S–1 section for inspection. Lindsay's suspicions obviously and justifiably aroused by this unheard-of volunteering for inspection, he asked Sergeant Ramon, "Is there anything special going on in the S–1 shop that I should know about?," to which Ramon replied, "I don't think I'm at liberty of discussing this with you at this particular time, sir." The majority claims not to see a " 'wink and a nod' " in this scenario. 41 MJ at 172. To the contrary, I think it is preposterous that a commander would have his suspicions satisfied by this exchange. If anything, the response likely heightened, rather than allayed, his suspicions.

Second, I do not agree with the Chinese Wall that the majority builds up around the commander who made the inspection decision here, isolating him and insulating him as a matter of law from information held by his subordinates. I would not impute to such a commander, without more, the knowledge held only by a subordinate; but where that subordinate, because of that knowledge, affirmatively influences the commander's decision whether to inspect or whom to inspect, the whole rationale underlying Mil.R.Evid. 313 is undermined. A subordinate cannot knowingly withhold information from the commander or mislead the commander in some material respect *and* then proceed to influence the commander's inspection decision. *Cf. Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (essential statement in police affidavit for search warrant that is a deliberate falsehood or made in deliberate disregard of the truth voids warrant).

II

Not content to limit itself to answering the granted issue, the majority spends substan-

tial time—via dicta of the highest order—signaling an apparent readiness to roll back decades of struggle by this Court to reconcile the legitimate needs of military authorities emanating from the unique demands of military readiness, on the one hand, with the often-subconscious but nonetheless firmly implanted expectations of human and civil rights held by citizens of this country, on the other. That is not always an easy fit, but it is one that must be sought.

In very general terms, that fit has been found by inquiring in each instance whether a claimed "military exception" to an otherwise protected area of individual rights *truly* was *necessary:* If so, the individual rights of those then in military service give way for the good of the larger society which they serve; if not, those rights shield the uniformed citizen as much as his or her civilian brothers and sisters against the might of government. *See generally Weiss v. United States,* —— U.S. ——, ——, 114 S.Ct. 752, 769, 127 L.Ed.2d 1 (1994) (Ginsburg, J., concurring) ("The care the Court has taken to analyze petitioners' claims demonstrates once again that men and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter military service.").

In my view, the majority's gratuitous comments on the military search totally disregard the historical development in this area of our jurisprudence and are of academic interest at best.