UNITED STATES, Appellee

v.

Ronald E. SHOVER, Jr., Staff Sergeant
U.S. Air Force, Appellant.

No. 95–0890.
Crim.App. No. 30728.

U.S. Court of Appeals for
the Armed Forces.

Argued May 23, 1996.

Decided Sept. 24, 1996.

For Appellant: Captain Robert K. Coit, USAFR (argued); Colonel Jay L. Cohen (on brief); Captain Eric N. Eklund.

For Appellee: Major Allen G. Erickson (argued); Colonel Jeffery T. Infelise and Lieutenant Colonel Michael J. Breslin (on brief).

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer and enlisted members at Norton Air Force Base, California, convicted appellant, contrary to his pleas, of wrongfully using methamphetamine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 4 months, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 42 MJ 753 (1995).

We granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED APPELLANT'S MOTION TO SUPPRESS THE RESULTS OF APPELLANT'S URINAL-

YSIS IN THAT THE PROSECUTION FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE RESULTS WERE ADMISSIBLE AS THE FRUITS OF A VALID INSPECTION WHEN THE EVIDENCE CLEARLY SHOWED THAT THE PURPOSE OF THE INSPECTION WAS TO OBTAIN EVIDENCE IN A CRIMINAL INVESTIGATION.

## II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE GRANTED THE PROSECUTION'S MOTION TO EXCLUDE ANY EVIDENCE OF A PREVIOUS, RECENT ATTEMPT OF AN UNKNOWN PERSON TO PLANT DRUGS ON AN OFFICER WHO WORKED IN THE SAME BUILDING AS APPELLANT.

We resolve both issues against appellant.

Special Agent (SA) John Bornt of the Air Force Office of Special Investigations (OSI) testified that on August 28, 1992, he received an anonymous telephone call. The caller said that Major (Maj) Adams, Chief of the Consolidated Base Personnel Office (CBPO), was involved in a sale of marijuana in the CBPO parking lot. On September 4, Maj Adams discovered marijuana in her briefcase. She apparently reported it to the OSI. The OSI interviewed Maj Adams, offered her a polygraph examination, and thereafter cleared her of any wrongdoing. The OSI concluded that someone probably had placed the marijuana in Maj Adams' briefcase while it was in her office. SA Bornt testified that they looked at who had access and motivation to put marijuana in Maj Adams' briefcase. They interviewed a group selected at random by one of the officers at CBPO. Three persons were targeted based on "the best motivation and best access" to Maj Adams' briefcase. Appellant was not one of those targeted.

SA Bornt testified that he briefed Maj Stringfield, deputy staff judge advocate and chief of military justice at Norton AFB. She asked SA Bornt what he thought about the "potential benefits" of conducting a urinaly-sis. At the time, thinking she was referring to the entire unit rather than just CBPO, SA Bornt responded that "it sounds like a good idea." He testified, however, that he did not think it would help OSI find out who had attempted to frame Maj Adams, but he thought that the Adams incident might indicate some drug problems in the unit.

SA Bornt testified that he did not brief the squadron commander, Maj Kera, or the acting group commander, Lieutenant Colonel (LtCol) Schell, about the benefits of a urinalysis. After Maj Stringfield told him she would approach command about it, he "was basically out of it."

LtCol Schell testified that he ordered the urinalysis of all military personnel in Building 505 (the location of CBPO). Col Underwood, commander of the 63d Support Group, was absent, and LtCol Schell had assumed command in his absence. In his written order, LtCol Schell ordered that "all military personnel assigned to duty in building 505, Norton AFB ... provide urine samples" to be tested for "illegal drugs." He further ordered that those who were on leave, temporary duty, or sick in quarters "shall provide a urine sample for testing on the first duty day after returning to duty."

LtCol Schell testified that the incident involving Maj Adams caused him to accept the suggestion from "the Judge Advocate's office" and order the urinalysis. He testified that there was "a lot of finger pointing, hard feelings," and "tension" in Building 505 as a result of the Adams incident. LtCol Schell "wanted to get people either cleared or not cleared."

LtCol Schell testified that no particular person was targeted for investigation so far as he knew. LtCol Schell also ordered a sweep of Building 505 by drug detection dogs. The drug dogs swept the building before the urinalysis but detected nothing.

Col Underwood testified that he participated in "discussions way before that urinalysis took place." He testified that "the thing that we thought is that there may be a high degree of probability that the person who planted the marijuana could have also been

using it—or an illicit drug of some sort." He testified that "[t]here were morale problems in the unit," but "[t]he morale problems were not the reason for the urinalysis." Col Underwood testified that he was absent from his command on leave from September 8 through 16 and from September 19 through 26. He remembered "discussing options" but not making any decisions before departing on leave. The decision to order the urinalysis was made in his absence, and the plans were finalized by LtCol Schell while he was in command.

The urinalysis originally was scheduled for Friday, September 18. It was moved to Monday, September 21, "because Col Hopper, the Wing Commander, generally believed that drug use was more prevalent on weekends," so a urinalysis on a Monday would be more effective in detecting drug use. Although LtCol Schell ordered the urinalysis, he testified that the change of date from September 18 to September 21 was "not my decision."

According to a stipulation of fact, Senior Master Sergeant Whittington, the Mission Support Squadron (MSSQ) First Sergeant, acknowledged that a number of unit members did not appear for the urinalysis, but no action was taken to test them. The absent members were not excused; "it was just an administrative error." Fifty-nine of the 79 members of appellant's unit were tested. Only appellant tested positive for any drug.

At trial, defense counsel moved to suppress the fruits of the urinalysis on the ground that the purported inspection was a subterfuge for an illegal search. The military judge denied the motion. In his findings of fact and conclusions of law, he concluded that LtCol Schell's "primary purpose was to resolve the questions raised by the Adams incident, not to prosecute someone." Although the military judge labeled it as a conclusion of law, the court below treated his "conclusion" concerning LtCol Schell's "primary purpose" as a finding of fact. 42 MJ at 755. We agree with this characterization. *See United States v. Gardner*, 41 MJ 189, 191 (CMA 1994) ("military judge's finding re-

garding the 'primary purpose' is a matter of fact").

Appellant's defense was based on innocent ingestion. Defense counsel wanted to ask SA Bornt about the effort to frame Maj Adams on the theory that if someone planted marijuana in Maj Adams' briefcase, "somebody else may have planted methamphetamine in Sergeant Shover's coffee." Trial counsel moved *in limine* to suppress any reference to the Adams incident on the ground that it was irrelevant. The military judge granted trial counsel's motion *in limine*. He explained:

> It takes a fairly large leap to conclude from Major Adams' [unknowing] possession of marijuana something about Sergeant Shover's alleged use of methamphetamine—different person, different drug—if planted in both cases, a different way. I mean, one to show possession and one to show use. Even if you conclude that there's some minimal relevance of that, I am persuaded that the likelihood of confusion of what the issues are before this court and the waste of time are not worth it under Rule 403.

Appellant testified in his own defense. He described his activities before the urinalysis and denied experiencing anything that would indicate use of methamphetamines. When trial counsel asked him if he thought he could get by with lying, appellant responded, "No, sir. I'm innocent, and I'm gonna stick to that."

The military judge instructed the members that "[t]he evidence has raised the issue of ignorance in relation to wrongful use of methamphetamine." He instructed the members that appellant could not be convicted "[i]f he was, in fact, ignorant of the fact that he was ingesting a controlled substance." He also told them that the defense would "not exist" if the members "were satisfied beyond a reasonable doubt that the accused was not ignorant" as he claimed.

### Motion to Suppress Urinalysis Evidence (Issue I)

■ Appellant argues that the military judge erred because the prosecution failed to

show by clear and convincing evidence that the urinalysis was a valid inspection. The Government argues that the prosecution met its burden.

The parties agree that the urinalysis evidence is governed by Mil.R.Evid. 313, Manual for Courts–Martial, United States (1995 ed.). It defines an inspection as "an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include ... an examination to locate and confiscate unlawful weapons and other contraband." On the other hand, the rule provides that "[a]n examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or other disciplinary proceedings is not an inspection within the meaning of this rule." The rule further provides that "the prosecution must prove by clear and convincing evidence that the examination was an inspection" where "a purpose ... is to locate weapons or contraband, and if ... the examination was directed immediately following a report of a specific offense in the unit, ... and was not previously scheduled[.]"

■ In *United States v. Gardner*, 41 MJ at 191, we held that "the military judge's finding regarding the 'primary purpose' is a matter of fact," and "the issue of whether the examination is an inspection is a matter of law that this Court will review *de novo*." A military judge's preliminary finding of fact will not be overturned unless clearly erroneous, but his rulings on questions of law are reviewed *de novo*. *See United States v. Sullivan*, 42 MJ 360, 363 (1995) (factfinding reviewed "under the clearly erroneous standard and conclusions of law under the *de novo* standard").

■ Because the urinalysis "was directed immediately following a report" that an unknown person had planted marijuana in Maj Adams' briefcase, the burden was on the prosecution to "prove by clear and convincing evidence" that the urinalysis was an inspec-

tion within the meaning of Mil.R.Evid. 313. In deciding whether a urinalysis is a valid inspection or a subterfuge search, the focus is on the commander who ordered the urinalysis. *United States v. Taylor*, 41 MJ 168, 172 (CMA 1994). Thus, we focus on Lt Col Schell, who was in command at the time in question, and who planned and ordered the urinalysis. He testified unequivocally that his purpose was to end the "finger pointing, hard feelings," and "tension" in the unit and "get people either cleared or not cleared." He testified that no particular person was targeted. Based on his testimony, we hold that the military judge's finding of fact concerning the primary purpose of the urinalysis was supported by the evidence and therefore not "clearly erroneous."

Turning to the legal question whether the urinalysis was an "inspection" instead of a search, we hold that the military judge correctly applied the standards set out in Mil. R.Evid. 313 and the decisions of this Court. Accordingly, the military judge did not abuse his discretion by admitting the urinalysis evidence.

## Evidence of Attempted Frame-up (Issue II)

■ Appellant contends that the military judge abused his discretion by excluding evidence of the attempt to frame Maj Adams because the evidence was relevant to his claim of innocent ingestion. The Government disagrees.

Mil.R.Evid. 403 empowers a military judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The proponent of the evidence has the burden of showing admissibility. *See* S. Saltzburg, L. Schinasi & D. Schlueter, *Military Rules of Evidence Manual* 422 (3d ed.1991), citing Mil.R.Evid. 103. When a military judge exercises discretion under Mil. R.Evid. 403 and excludes evidence, "appellant has the burden of going forward with conclusive argument that the judge abused

his discretion." *United States v. Mukes,* 18 MJ 358 (CMA 1984).

We hold that the military judge did not abuse his discretion. We agree with the military judge that the two incidents were too dissimilar. Maj Adams was a supervisor; appellant was not. The Adams incident involved marijuana; appellant's case involved methamphetamines. The Adams incident involved allegations of possession and sale; appellant was charged with use. Finally, we agree with the observation of the court below that appellant's speculative theory that someone "spiked" his coffee at work is undermined by the fact that no one else in the unit who had access to the coffee tested positive for drugs. 42 MJ at 757.

### Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judge CRAWFORD concur.

EVERETT, Senior Judge (concurring in part and dissenting in part):

I disagree with the majority opinion on the first issue for the reasons stated in the dissenting opinion of Chief Judge Dixon in the court below. 42 MJ 753, 757 (1995).

As to whether the challenged urinalysis was a lawful inspection under Mil.R.Evid. 313, Manual for Courts–Martial, United States (1995 ed.), I need go no further than the testimony of the acting commander and the consistent findings of the military judge. The former revealed that there had been " 'a lot of finger pointing, hard feelings,' and 'tension' in Building 505 as a result of the Adams incident" and he "wanted to get people either *cleared or not cleared.*" 45 MJ at 120 (emphasis added). The judge found as fact that the acting commander's "primary purpose [in ordering the urinalysis] was to *resolve the questions raised by the Adams incident,* not to prosecute someone." (Emphasis added.)

Thus, both this finding of fact and the acting commander's testimony shout, loud and clear, that the urinalysis was ordered to assist an investigation of the Air Force Office of Special Investigations, not out of some general concern for the well-being of the unit as that might be affected by the presence in the unit of contraband drugs. At a minimum, the Government failed to carry its burden of providing clear and convincing evidence to the contrary. *See* Mil.R.Evid. 313(b). A dragnet search, focused on finding criminal evidence and/or criminals themselves, even without a particular suspect in mind, nonetheless remains a search. The additional factors relied upon by Chief Judge Dixon add even greater weight to these conclusions.

SULLIVAN, Judge (dissenting):

I agree with Senior Judge Everett's dissent and with Chief Judge Dixon's dissent in the court below (42 MJ 753, 757), as well. Resolution of this case by the majority demonstrates some inherent difficulties in applying Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1984. A commander's intent to prosecute is logically consistent with, and in military parlance practically indistinguishable from, an intent to maintain the security, military fitness, or good order and discipline of his unit. In addition, in my view denial of defense evidence tending to show unknowing ingestion by appellant under the rubric of irrelevance is simply unwarranted. Accordingly, I dissent.

Until today this Court, when determining the validity of inspections under Mil.R.Evid. 313(b), had placed great weight on prior reports of criminal activity. For example, in *United States v. Campbell,* 41 MJ 177, 182 (CMA 1994), we said that "[p]roof of selection based on standard criteria or routine practice is well recognized as clear and convincing evidence that the persons inspected were not *principally chosen on the basis of suspicion of criminal activity* amounting to less than probable cause." (Emphasis added.) Moreover in a companion case to *Campbell,* the majority [*] upheld an inspection under Mil.R.Evid. 313(b) because, prior to ordering the inspection, "there had not

[*] I dissented in that case.

been a 'report of a specific offense in the unit.' " *United States v. Taylor*, 41 MJ 168, 172 (CMA 1994). Today, I wonder if the majority means to overrule those cases because it effectively ignores the impact a report of prior criminal activity had on Lieutenant Colonel Schell's decision to order the so-called "inspection."

I have no doubt that Lt Col Schnell generally had it in his mind to use the urinalysis to maintain good order and discipline in his unit. *See* Mil.R.Evid. 313(b). However, his primary purpose in his own words "was to end the 'finger pointing, hard feelings,' and 'tension' in the unit and 'get people either cleared or not cleared.' " 45 MJ at 122. In my view, this urinalysis was "[a]n examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings.... " Mil.R.Evid. 313(b). Any other construction of this officer's words ignores their plain meaning and renders Mil.R.Evid. 313(b) meaningless.

The words of Lt Col Schnell's superior officer, Colonel Underwood, confirm my view. Col. Underwood testified:

Q [DC] Okay. Do you have an opinion about what the urinalysis ... would do, at the time—not in hindsight but at the time?

A There were discussions way before that urinalysis took place. And, specifically, I don't recall ... I think the thing that we thought is that there may be a high degree of probability that the person who planted the marijuana could have also been using it—or an illicit drug of some sort.

Q I'm sorry, sir?

A Any kind of illicit drug. We felt that, obviously, if they had access, they may be using it themselves.

Q And so if you did a urinalysis, you'd be able to find out who?

A Maybe.

Q And so that would have been the benefit of urinalysis?

A It may have helped us.

\* \* \*

Q [TC] ... Now, in regard to your discussions regarding the reason for urinaly-

sis, was there any discussion concerning morale problems in the unit as justification for the urinalysis, to your recollection?

A No.

Q All right.

A There were morale problems in the unit. That had nothing to do with the urinalysis. And there were some organizations ...

Q But as a reason for the urinalysis, for taking the urinalysis?

A No. Correct. The morale problems were not the reason for the urinalysis.

Q The reason for the urinalysis was to further the Adams investigation. That's your understanding?

A Yes. Now, I was on leave, and so this all took ... some of these plans and details were finalized during a period of time when I was absent by my Deputy [Lt Col Schell].

I also dissent from the majority's holding that the military judge did not abuse his discretion in excluding defense evidence that marijuana had been planted in an officer's briefcase in appellant's building around the time of appellant's positive urinalysis. Appellant's defense in this case was innocent ingestion. That *illegal drugs* had been planted on an officer who worked in *the same building as appellant around the same time* as appellant's positive drug test was clearly *relevant* to this defense. *See United States v. Morgan*, 581 F.2d 933, 936–37 (D.C.Cir. 1978) (evidence another person in building selling same kind of drugs "decidedly relevant" to determine whether there was intent to distribute); *cf. United States v. Hargrove*, 33 MJ 515 (AFCMR 1991) (evidence of tampering with urinalysis at Andrews AFB held not relevant to urinalysis at Scott AFB). These facts provide logical support for an inference that appellant, who worked in the same building and at same time was found with illegal drugs in his person, may likewise have had those drugs foisted upon him. The military judge and the appellate court below provided no reason for concluding that this marijuana-planting attempt had *no tendency* to make appellant's defense of innocent ingestion "more probable." Mil.R.Evid. 401.

The majority of this Court, perhaps uncomfortable with such an obviously incorrect relevance holding, attempts to hang its hat on Mil.R.Evid. 403, which states:

**Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The majority's stated points of dissimilarity, however, go only to the weight to be afforded this evidence by a factfinder. Moreover, no mention was made by the majority or the lower appellate court of the express concerns of Mil.R.Evid. 403, such as unfair prejudice, confusion, or delay. Finally, no consideration whatsoever is given to the fact that this evidence corroborated appellant's only defense of innocent ingestion. In my view, the military judge's evidentiary ruling was based on incorrect principles of law. *See Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996) ("A district court by definition abuses its discretion when it makes an error of law.")

I agree with Chief Judge Dixon's perceptive view of the realities of this court-martial, as follows:

An accused who relies upon unknowing ingestion as a defense to evidence of drug use derived from urinalysis testing has a very, very difficult task of convincing the fact-finders that the defense has merit. *Every accused is entitled to his day in court and should in the exercise of his due process right be afforded great latitude in presenting a defense. Basic fairness suggests to me that this appellant should have been allowed to present to the jury the information concerning the recent planting of marijuana in his building and to make the argument that the same individual may somehow have been responsible for his unknowing ingestion of the drug he was charged with using.*

42 MJ at 759 (emphasis added). As I said in an earlier opinion:

An American servicemember has a constitutional and codal right to defend himself or herself at a court-martial. The majority today eviscerates this right by utilizing the rubric of judicial reasonableness to preclude even consideration of her defense by court members. Her defense to the charge was not a strong one, but it *was* her only one.

*United States v. Rankins,* 34 MJ 326, 336 (CMA 1992) (Sullivan, C.J., dissenting).

Under the circumstances of this case, I conclude that it was constitutional error to cut off appellant's sole defense. *See United States v. Woolheater,* 40 MJ 170 (CMA 1994). I would reverse the decision below and order a rehearing.