UNITED STATES, Appellee,

v.

Antonio JACKSON, Private,
U.S. Army, Appellant.

No. 96–1402.
Crim.App. No. 9401052.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 6, 1997.

Decided Sept. 2, 1998.

For Appellant: *Captain Stephen P. Bell, Jr.* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Michael L. Walters,* and *Captain Michael E. Hatch* (on brief).

For Appellee: *Lieutenant Colonel Frederic L. Borch, III* (argued); *Colonel Joseph E. Ross* and *Captain Elizabeth N. Porras* (on brief); *Captain Joanne P. Tetreault.*

*Opinion of the Court*

EFFRON, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of wrongful possession of marijuana with intent to distribute and unlawfully carrying a concealed weapon, in violation of Articles 112a and 134, Uniform Code of Military Justice, 10 USC §§ 912a and 934, respectively. He was sentenced to

a bad-conduct discharge, confinement for 4 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed in an unpublished opinion.

We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED WHEN HE RULED THAT THE GOVERNMENT HAD PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT THE SEARCH OF APPELLANT'S BARRACKS ROOM WAS A VALID HEALTH AND WELFARE INSPECTION AND THAT THE SEARCH WAS LAWFUL BECAUSE APPELLANT HAD NO REASONABLE EXPECTATION OF PRIVACY IN HIS BARRACKS ROOM.

We hold that the military judge did not err in finding that the search was a valid health and welfare inspection within the meaning of Mil. R.Evid. 313(b), Manual for Courts–Martial, United States (1995 ed.).

## I. BACKGROUND

A fundamental precept of military leadership is that commanding officers are accountable for the training, readiness, and performance of their units. The President, in furtherance of this vital principle of command responsibility, has authorized commanding officers to conduct inspections of their units—"as an incident of command"—when "the primary purpose ... is to determine and to ensure the security, military fitness, or good order and discipline of the unit...." Mil.R.Evid. 313(b).

In *United States v. Middleton,* 10 MJ 123 (1981), our Court unanimously sustained the authority of commanders to conduct unit inspections. We noted that "such inspections are time-honored and go back to the earliest days of the organized militia." We observed that "the inspection has traditionally been a 'tool' for a commander to use in insuring 'the overall fitness of [his] unit to perform its military mission.' " *Id.* at 127 (citations and footnote omitted). After noting that the services "have made increasing efforts to provide privacy for servicemembers in their dor-

mitories and barracks," *id.* at 128 n. 8, we emphasized that, "[w]hile the living conditions of the modern serviceperson may be more comfortable—and, indeed, more private—than those known by their fathers, still the basic purpose for existence of the military has not altered; and neither has the need for the tool of inspection to insure the readiness of the individual serviceperson and of his unit to respond to an emergency." *Id.* at 128 (footnote omitted).

With respect to the expectations of privacy under the Fourth Amendment, we concluded that, "during a traditional military inspection, no serviceperson whose area is subject to the inspection may reasonably expect any privacy which will be protected from the inspection." *Id.* at 128. At the same time, we noted that an inspection might not be sustained if its character changed during the process or if the circumstances were unreasonable. *Id.* at 128 nn. 9 and 10. The President has implemented this concern in Mil.R.Evid. 313(b) by providing that the "primary purpose" of an inspection cannot be to "obtain[ ] evidence for use in a trial by court-martial." However, the Rule expressly permits use of the fruits of an inspection in a disciplinary proceeding, so long as the primary purpose is "to determine and to ensure the security, military fitness, or good order and discipline of the unit[.]"

Mil.R.Evid. 313(b) makes clear that it is reasonable for an inspection to include "an examination to locate and confiscate unlawful weapons and other contraband" and permits such an examination, even if it "was directed immediately following a report of a specific offense in the unit ... and was not previously scheduled[.]" In order to meet the primary purpose test in such a case, the Government must "prove by clear and convincing evidence" that the examination met the criteria for an inspection with regard to its military purpose.

Mil.R.Evid. 313(b) specifically recognizes that there is no need for an inspection to be preplanned or randomly scheduled. The inquiry under Mil.R.Evid. 313(b) focuses on whether the "primary purpose" of the inspection was "to determine and to ensure the

security, military fitness, or good order and discipline of the unit." *See also United States v. Taylor,* 41 MJ 168, 172 (CMA 1994) ("principal focus" is on the role of the commander); *United States v. Gardner,* 41 MJ 189, 191 (CMA 1994) ("litmus test is whether the examination is made primarily for administrative purposes or instead for obtaining incriminating evidence"); S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 342 (4th ed.1997).

■ So long as the primary purpose of the examination is "unit readiness" and not disciplinary proceedings, it is permissible both: (1) for an inspection to take place after the commander receives specific information about the presence of contraband; and (2) for an inspection for weapons or contraband to result in disciplinary proceedings.

## II. FACTS

On January 26, 1994, appellant's unit commander, Captain (CPT) Lamport, was informed by Criminal Investigation Command (CID) Special Agent (SA) Foster that an anonymous female friend of appellant had reported that she had witnessed appellant selling drugs in his barracks room the previous evening. The woman also had said that appellant hid the drugs in a stereo speaker in his room.

This information raised two separate concerns. First, that a member of CPT Lamport's unit might have committed a crime in the barracks. Second, that as a result of this activity, illegal drugs may have been distributed to others within the barracks, thereby undermining the military readiness of the unit. Although CPT Lamport—after consulting with the battalion's legal adviser—concluded that the information was not sufficiently reliable to authorize a probable cause search of appellant's room under Mil.R.Evid. 314, he determined that the information about distribution of drugs in the barracks was sufficient to raise concerns about the readiness of the unit.

As a result of these concerns, CPT Lamport ordered a health and welfare inspection "to find out on a whole what the unit was like

for drugs and if anybody else had been using" drugs. CPT Lamport contacted the local canine unit, had a dog handler prove the reliability of the dog's drug-sniffing capability, and posted non-commissioned officers (NCOs) as guards at all entrances and exits to prevent the removal of evidence. All 36 barracks rooms assigned to members of CPT Lamport's unit were inspected, and CPT Lamport told the inspector to "look at every room" and not to focus on any particular room.

The health and welfare inspection took place about "an hour to an hour and a half after" SA Foster told CPT Lamport about the anonymous tip. The inspection was carried out by two canine units (dogs and handlers), SA Foster (accompanying the canine team chief), and "numerous NCOs."

After one of the drug dogs alerted in appellant's room, SA Foster, who was standing by in case any drugs were found, entered the room to help the canine team. The dog handler opened a stereo speaker and discovered a small bag, which he suspected contained marijuana. SA Foster conducted a field test of the substance and confirmed that it was marijuana. The record does not reflect whether SA Foster departed the barracks after he seized the marijuana or remained with the canine team until the examination of all 36 rooms was completed.

## III. DISCUSSION

At trial, the defense moved to suppress the fruits of the inspection on the ground that it was an illegal search. The Government offered the testimony of CPT Lamport, who stated that after learning that appellant was involved in distribution of drugs and was hiding drugs in his barracks room, he decided to conduct a health and welfare inspection "to find out if there were drugs in the barracks and if anybody else had been using" drugs. He stated that his "primary motivation" for ordering the inspection was "unit readiness and also to find out on a whole what the unit was like for drugs. . . . If there was any contraband in the rooms or anything else." In ruling on the motion to

suppress, the military judge found that the primary purpose of the examination was to ensure "unit readiness."

We previously have held that a military judge's finding regarding the "primary purpose" of an inspection is a question of fact, which will be sustained on appeal unless clearly erroneous. *United States v. Shover,* 45 MJ 119, 122 (1996). Regardless whether this is a question of fact or a mixed question of fact and law, we agree that the Government met its burden in demonstrating that the primary purpose of the inspection was to insure unit readiness.

■ Physical and mental fitness are the quintessential requirements of military readiness. The use of illegal drugs significantly diminishes the user's physical and mental capabilities. Any commander who ignores the potential presence of illegal drugs in the unit does so in disregard of his or her responsibility and accountability for the readiness of that unit. Regardless whether the information in this case was sufficient to establish probable cause for a search of appellant's room, it was more than adequate to provide CPT Lamport with a reasonable basis to assess the health and welfare of his unit.

■ The validity of the inspection is not affected by CPT Lamport's forthright testimony that he considered at the time that any contraband uncovered in the inspection could be used in an Article 15[1] nonjudicial punishment or court-martial proceeding. Mil. R.Evid. 313(b) expressly permits use of the results of a lawful inspection in such proceedings, and any other answer from CPT Lamport would have reflected either an ignorance of the law or a lack of candor. There is no evidence, however, that the inspection was "a pretext or subterfuge for an otherwise illegal search." *Gardner, supra* at 191. Appellant's prosecution "was merely incidental punitive action ancillary to an otherwise justifiable inspection." *Id.* at 192. Contrary to appellant's suggestion, there is no evidence that he "was specifically targeted after his command received an anonymous tip that he

---

1. Uniform Code of Military Justice, 10 USC § 815.

was selling drugs." Final Brief at 11; *compare United States v. Turner,* 33 MJ 40, 42 (CMA 1991) ("no evidence tending to show" that the purpose of the urinalysis was other than unit readiness), *with United States v. Campbell,* 41 MJ 177, 183 (CMA 1994) (test based on "suspicion of criminal activity"), and *United States v. Thatcher,* 28 MJ 20, 25 (CMA 1989) (appellant was the "prime suspect" in the theft).

■ We reject the suggestion that the presence of drug detector dogs and the CID agent indicates that this was not a valid unit inspection. Mil.R.Evid. 313(b) expressly permits an inspection to detect weapons and contraband. If the commander's primary purpose is "unit readiness," the commander is not prohibited from engaging expert assistance in structuring or conducting the inspection and ensuring proper disposition of any weapons or contraband located during the inspection. Likewise, the commander is not prohibited from taking steps to ensure that weapons and contraband are not removed during the inspection. Insofar as Mil. R.Evid. 313(b) permits inspections for weapons and contraband and mixed-use examinations (*e.g.,* unit readiness as the primary purpose and criminal prosecution as a secondary purpose), use of the expertise of law enforcement personnel in dealing with weap-

ons and contraband is appropriate. *Cf. Middleton, supra* at 129.

■ Whether the Government can meet the clear-and-convincing standard will depend on the facts and circumstances of the case, including the nature of the contraband. Given the oft-cited adverse impact of drugs on unit readiness, it is permissible for the military judge to take into account the nature of the contraband in determining that the threat to unit readiness, rather than the criminal prosecution of an individual, was the primary purpose for a unit inspection. *See United States v. Bickel,* 30 MJ 277, 280 (CMA 1990) (drug use "harms the military mission," "diminishes the military effectiveness," and "may endanger" other persons and property); *Middleton, supra* at 129 n. 11; *cf. Shover, supra* at 120, 122; *Gardner, supra* at 192.

■ We hold that the Government demonstrated, through CPT Lamport's testimony, that the "primary purpose" of the search was "unit readiness." We conclude, therefore, that the search of appellant's barracks room was a valid health and welfare inspection within the meaning of Mil.R.Evid. 313(b).[2] Based on the demonstrated reliability of the drug dog's ability, once the dog alerted at appellant's stereo speaker, SA Foster had

---

2. We reject the suggestion in the dissent that the majority opinion "removes any expectation of privacy for soldiers living in a barracks, eliminates any meaningful distinction between a search and an inspection, ... renders Mil. R.Evid. 315 (probable-cause searches) meaningless and unnecessary[, and] removes the protection of privacy rights that were ... conferred by the President in Mil.R.Evid. 313(b)." 48 MJ at 297. To paraphrase Mark Twain, the report of the demise of the rules concerning privacy of servicemembers has been greatly exaggerated. *The Oxford Dictionary of Quotations* 706 (4th ed.1992).

Our opinion is grounded in Mil.R.Evid. 313(b), which was promulgated by the President and which permits inspections for weapons and contraband following a report of an offense under specified circumstances. Nothing in our opinion permits such inspections to be used to bypass the requirement for probable cause to search for weapons or contraband under circumstances that would not be permitted by Mil.R.Evid.

313(b); nor does our opinion apply to evidence other than weapons or contraband.

Contrary to the suggestion in the dissent that, under the majority opinion, a commander need only "invoke his concern for unit readiness to bypass the requirement for probable cause," 48 MJ at 297, we do not hold or imply that a commander can simply incant magic words to justify an inspection for weapons or contraband. Our opinion notes that whether the Government can meet the "clear and convincing" standard of Mil.R.Evid. 313(b) to justify an inspection for weapons or contraband depends on the specific facts and circumstances of the case, including the nature of the contraband. 48 MJ at 296. In the present case, the commander was provided with information indicating an ongoing problem of illegal drug distribution in the barracks. The commander testified as to the nature of the information and the potential impact on the unit. Under such circumstances, the military judge was well within his authority to find that the Government had presented clear and convincing evidence that the commander's primary purpose for the inspection was unit readiness.

probable cause to open the speaker, where he discovered the marijuana. *See United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Alexander*, 34 MJ 121, 125 (CMA 1992); *Middleton, supra* at 134–35.

## IV. DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN and CRAWFORD concur.

GIERKE, Judge (dissenting):

In my view the majority opinion removes any expectation of privacy for soldiers living in a barracks, eliminates any meaningful distinction between a search and an inspection, and renders Mil.R.Evid. 315, Manual for Courts–Martial, United States (1995 ed.) (probable-cause searches), meaningless and unnecessary. It likewise removes the protection of privacy rights that were, in my opinion, conferred by the President in Mil. R.Evid. 313(b). The majority opinion results in the anomalous situation where it may be unlawful to invade the privacy of one soldier unless the privacy of 100 others is invaded at the same time.

Clearly, there will be no need to establish probable cause and obtain authorization for a search if the same thing can be accomplished by conducting an "inspection." The commander will need only to invoke his concern for unit readiness to bypass the requirement for probable cause.

Drugs are illegal because they are detrimental to unit readiness. *See United States v. Middleton*, 10 MJ 123, 129 n. 11 (CMA 1981); *see also United States v. Shover*, 45 MJ 119, 123 (1996) (Sullivan, J., dissenting) ("A commander's intent to prosecute is logically consistent with, and in military parlance practically indistinguishable from, an intent to maintain the security, military fitness, or good order and discipline of his unit."). Indeed, before enactment of Article 112a,[1] drug offenses were prosecuted under Article 134 [2]

as offenses prejudicial to good order and discipline. *See* para. 213a, Manual for Courts–Martial, United States, 1951; *see also United States v. Foster*, 40 MJ 140, 143 (CMA 1994) (violation of an enumerated article of UCMJ "*per se* is either prejudicial to good order and discipline or brings discredit to the armed forces"). Thus, concern about unit discipline and effectiveness tells us little about prosecutorial intent. To conclude that concern for unit readiness obviates the requirement for probable cause is, in my view, faulty reasoning.

Mil.R.Evid. 313(b) places the burden on the prosecution to prove by "clear and convincing evidence" that a previously unscheduled examination for contraband immediately following a report of a specific offense is nonetheless a valid inspection. If the prosecution cannot meet this burden, then the fruits of the purported inspection may not be admitted in evidence. Unfortunately, the majority opinion's analysis stops with CPT Lamport's incantation of the magic words "unit readiness," instead of examining the objective facts surrounding the purported inspection.

In *United States v. Ellis*, 24 MJ 370, 372 (1987), this Court held that a purported inspection may "be transformed into a search requiring probable cause if it was conducted as a subterfuge . . . or was conducted in an unreasonable manner." (Citations and footnote omitted). In such a case, "the servicemember retains an expectation of privacy in the particular property which is intruded upon." *Id.* More recently, in *United States v. Thatcher*, 28 MJ 20, 24 (1989), this Court reinforced *Ellis*, saying, "[I]f an intrusion on privacy is really an 'inspection' and complies with Mil.R.Evid. 313, no reasonable expectation of privacy has been violated; but if the purported inspection is only a subterfuge for a search or is not properly conducted, then a violation has occurred." Thus, if the purported inspection is a subterfuge for a search or is conducted in an unreasonable manner, the Government must demonstrate that there

---

1. Uniform Code of Military Justice, 10 USC § 912a.

2. UCMJ, 10 USC § 934.

was probable cause to search the area in question.

CPT Lamport did not think there was probable cause in this case and the Government does not argue that there was probable cause to search. Accordingly, the only question before us is whether there was a valid inspection under Mil.R.Evid. 313.

Mil.R.Evid. 313(b) defines an "inspection" as "an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle." Although it is permissible to inspect for weapons or contraband, the drafters of the rule recognized that there is "a strong likelihood of subterfuge" when an inspection for weapons or contraband that was not previously scheduled immediately follows a report of a specific offense. Drafters' Analysis of Mil.R.Evid. 313, Manual, *supra* (1995 ed.) at A22–25. Accordingly, the sixth sentence of Mil.R.Evid. 313(b) provides as follows:

> If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule.

While the military judge's finding regarding the commander's primary purpose is a matter of fact, the ultimate question whether an examination is a search or an inspection is a question of law that this Court reviews *de novo*. *United States v. Gardner*, 41 MJ 189, 191 (1994).

In *United States v. Taylor*, 41 MJ 168, 172 (1994), this Court held, in a divided opinion, that the "principal focus" is on the officer ordering the inspection when the question is whether the inspection was a subterfuge search for contraband rather than a lawful administrative inspection. In *Taylor* the unit commander had already decided to order a random urinalysis of his unit but had not decided the order in which sub-elements of his unit would be inspected. An officer and noncommissioned officer in the unit received information that a specific member of the unit was using drugs. They did not convey that information to the unit commander but, instead, they suggested that the section to which the suspected drug user was assigned be inspected first. A majority of the Court concluded that the sixth sentence of Mil.R.Evid. 313(b) was not triggered because the unit commander had not received a "report of a specific offense in the unit," even though his subordinates had. Two judges dissented in *Taylor* on the ground that the actions of the subordinate officer and noncommissioned officer should have been considered in determining whether a subterfuge search occurred. 41 MJ at 172–75.

In this case, unlike *Taylor*, the sixth sentence of Mil.R.Evid. 313(b) was triggered because the examination was not previously scheduled and was directed by the unit commander immediately following the tip to SA Foster that appellant was selling drugs from his barracks room. Thus the Government had the burden of proving "by clear and convincing evidence that the examination was an inspection."

A search is not transformed into an inspection merely by labeling it as an inspection. The purpose of the sixth sentence of Mil.R.Evid. 313(b) was to provide "objective criteria by which to measure a subjective standard, *i.e.*, the commander's purpose." Drafters' Analysis of Mil.R.Evid. 313(b), *supra*. Thus we must look at the circumstances, not merely the words used by the commander to describe the examination. While the commander's stated intent is an important factor, it is not a talisman at which legal analysis stops. *See Middleton*, 10 MJ at 131 n. 14 (purpose may be demonstrated not only by statements of commander but by the circumstances).

It is clear from CPT Lamport's testimony that this "inspection" was not preplanned. It was not in response to a perceived unit-wide drug problem. The purported inspection would not have been conducted but for SA Foster's report of an anonymous tip.

The purported inspection targeted appellant's drugs, not drugs in general. The tipster had specifically identified appellant as the person trafficking in marijuana. *See Thatcher*, 28 MJ at 25 (one of persons inspected was "prime suspect"). CPT Lamport consulted with the unit's assigned prosecutor and a criminal investigator before deciding to examine his unit. He was advised that he did not have enough information to constitute probable cause to search but, rather, that he could conduct an inspection. The examination was conducted as soon as CPT Lamport could marshal his noncommissioned officers and the law enforcement units accompanying them, including two canine teams and SA Foster, the same CID agent who had reported information about appellant's misconduct. Guards were posted to prevent removal of evidence. SA Foster stood by to seize and analyze evidence. There is no evidence in the record that CID agents had been present at previous inspections. There is no evidence that SA Foster remained present after his tipster's information was validated and the drugs seized from appellant's stereo speaker.

Although CPT Lamport used the appropriate words like "health and welfare" and "unit readiness," I do not believe that these words were sufficient, in light of all the surrounding circumstances, to constitute "clear and convincing" evidence that examination of the unit was a valid inspection. CPT Lamport's testimony must be balanced against the timing of the purported inspection, the specificity of the information that triggered the purported inspection, the involvement of prosecutorial and law enforcement authorities, the efforts taken to prevent removal of evidence, the failure of the Government to show that SA Foster's presence extended past the seizure of evidence from appellant's room, and the failure of the Government to show that CID presence during inspections was not unusual.

On this record, I would hold that the Government failed to meet its burden of proof. In so doing, I do not mean in any way to impugn the honesty or integrity of CPT Lamport. He relied on the advice of the unit's legal adviser. I also recognize the need to keep drugs and other contraband out of the unit and the usefulness of health and welfare inspections to accomplish this very important military purpose. It is my view, however, that under the circumstances of this case, the purported inspection was, in fact, a search conducted without probable cause. Accordingly, any evidence seized in that search was inadmissible at appellant's court-martial. I would reverse the decision of the court below.