**UNITED STATES, Appellee,**

v.

**Sergeant Leroy BROWN, Jr., United States Army, Appellant.**

**ARMY 9700954.**

U.S. Army Court of Criminal Appeals.

29 Oct. 1999.

For Appellant: Captain David S. Hurt, JA (argued); Colonel John T. Phelps II, JA; Major Leslie A. Nepper, JA; Captain Dirk Gifford, JA (on brief); Colonel Adele H. Odegard, JA; Major Jonathan F. Potter, JA.

For Appellee: Major Marcella Edwards–Burden, JA (argued); Colonel Russell S. Estey, JA; Lieutenant Colonel Eugene R. Milhizer, JA; Major Patricia A. Ham, JA (on brief).

Before CAIRNS, Senior Judge, BROWN, and VOWELL, Appellate Military Judges.

## OPINION OF THE COURT

VOWELL, Judge:

A special court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of wrongful use of cocaine and false swearing, in violation of Articles 112a and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 912a and 934 [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a reduction to Private E1 and a bad-conduct discharge.

This case is before the court for automatic review pursuant to Article 66, UCMJ. The primary evidence supporting the appellant's conviction for wrongful use of cocaine was a positive urinalysis test result. The appellant asserts that the urinalysis inspection was a pretext for an otherwise unlawful search and that pervasive deviations in the urine collection and transportation process rendered the test results unreliable. He also claims that the military judge erred in refusing to grant a post-trial challenge for cause of a court member.[1] We disagree and affirm.

## FACTS

The appellant was assigned to a transportation company commanded by Captain (CPT) Wendell. In late June 1996, Sergeant (SGT) Foreman (whose first name does not appear in the record of trial) approached First Sergeant (1SG) Brooks, the appellant's first sergeant, and informed him that several members of his unit were using illegal drugs. Sergeant Foreman was assigned to another

---

1. We have also considered the error raised personally by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find it to be without merit.

unit, but her husband, SGT Kendrick Foreman, was a member of the appellant's unit.[2] Sergeant Kendrick Foreman, apparently at his wife's urging, had recently referred himself for treatment for drug use.

Sergeant Foreman was reluctant to name the other unit individuals she suspected of using drugs, but after some persuasion, 1SG Brooks was able to convince her to write the names on a three-by-five card and to leave the card in his office. He retrieved the card after she departed, and took the card to CPT Wendell. Testimony at trial indicated that there were between four and six names on the card; whether the appellant's name was listed was not clear.[3] Both 1SG Brooks and CPT Wendell testified that Staff Sergeant (SSG) Norwood's name was on the list. Staff Sergeant Norwood's duties included running the monthly random urinalysis inspections of ten to fifteen percent of the unit.

Captain Wendell and 1SG Brooks discussed possible courses of action based on this allegation that several of the unit's noncommissioned officers (NCOs) were using drugs. Captain Wendell also sought advice from his battalion commander, who recommended consulting the unit legal adviser.

The legal advisor opined that the card and conversation with SGT Foreman did not constitute probable cause to command-direct a urinalysis of the individuals whose names were recorded on the card, but that a 100% unit urinalysis would be an appropriate response to this report of drug use. When CPT Wendell attempted to make arrangements for a 100% urinalysis with the installation biochemical testing office, he was advised that the office could not logistically support one, but could handle specimens from 30% of the unit, or approximately sixty-five soldiers.

In view of the allegations against the unit's alcohol and drug abuse coordinator, CPT Wendell wanted to keep the date of the 30% urinalysis secret, while conducting it as quickly as possible. First Sergeant Brooks, who usually selected the test date for the monthly urinalysis inspections, had not yet done so for July.

Names for the monthly random urinalysis tests were usually picked using a computer database containing the names of the unit's soldiers. The program, called ARCIS (Army Company Information System), was also used to track training and military personnel records. Staff Sergeant Norwood, or his assistant, SSG Rusyn, normally generated the urinalysis computer lists. Staff Sergeant Rusyn testified that lists could be generated one of two ways: individual soldiers could be "command directed" by inputting their names directly, or a random selection could be generated by entering either the percentage or number of soldiers desired. Because some soldiers on the random list might be on leave or absent due to temporary duty or mission requirements, a figure higher than the actual number needed to meet the quota was normally selected.

Faced with the possibility that his unit's previous negative results from urinalysis testing were the result of manipulation of the selection process or from advance warning to drug users, CPT Wendell decided to run the ARCIS program himself. On 3 July 1996, with coaching by the training NCO on the password-controlled system, CPT Wendell generated the list for the 9 July 1996 urinalysis. First Lieutenant (1LT) Koch, the unit's executive officer, testified that he watched the process. After CPT Wendell generated the list—a process that took between two and five minutes—he locked the list in his desk drawer and did not remove it until the morning of the urinalysis. The appellant was one of the sixty-eight unit members whose names appeared on that list, as were the names of four or five of the soldiers listed by SGT Foreman on the three-by-five card.

The defense presented the testimony of an expert in statistics, Mr. Heuckeroth, in an

---

2.  To distinguish between the two Sergeants Foreman, we will refer to the male SGT Foreman as SGT Kendrick Foreman.

3.  The three-by-five card was not introduced into evidence as it had been lost during the nearly 12 month period between the urinalysis and the

litigation of the motion to suppress the results of that urinalysis. First Sergeant Brooks testified that he thought the appellant's name was on the list; CPT Wendell testified that he did not think that it was.

effort to undermine the prosecution's theory that the list was randomly generated. While his testimony was less than clear, the gist of it was that it was highly unlikely that four or five individuals whose names appeared on the card would also appear on the 30% urinalysis list.

The import of this testimony was that someone, presumably CPT Wendell, manipulated the computer program to select specific individuals for testing, or made repeated "runs" of the program until a list containing the desired names appeared. Trial testimony refuted the first possibility, as the code "US" (for "unit sweep") appeared on the ARCIS-generated list, which indicated a random selection process. The unrebutted testimony of CPT Wendell and 1LT Koch that there was only one run of the ARCIS program refuted the second defense argument.

Staff Sergeant Phyall, the battalion drug and alcohol abuse coordinator, conducted the urinalysis. He candidly admitted that this test was not a textbook example of regulatory compliance. For example, he failed to brief either those being tested or the observers regarding their responsibilities and duties; some participants departed the sequestered testing area for the dining hall prior to giving their samples; and the area where the specimen bottles were collected from the observers was adjacent to a high traffic area of the unit. Additionally, observers signed the ledger after returning the specimen bottles, rather than when the bottles were issued; labels were not placed on specimen bottles until they were returned filled with urine; and SSG Phyall initialed the labels before they were placed on the bottles, rather than when he accepted custody of the full specimen bottles.

The appellant was unable to produce sufficient urine for testing on his first attempt. His unlabeled specimen bottle was placed, with his military identification card, into the last open space of a specimen box, where it remained for about an hour and a half. The box, which could hold up to twelve specimen bottles, was subdivided into twelve numbered sections. The appellant's specimen bottle and identification card were placed in section twelve.

While the appellant was waiting until he could urinate again, the commander entered the dayroom area, exhorted the remaining participants to drink water, and poured them water himself. The appellant complied, and when he was ready to urinate, his partially filled specimen bottle was retrieved from the box. He and his observer returned to the latrine where the observer once again watched him urinate into the bottle. The label was affixed to the bottle upon returning from the latrine and initialed by the appellant and the observer. Staff Sergeant Phyall placed tamper-resistant tape on the bottle, placed the bottle back into the box, and closed it, as the appellant's sample completed the box. At some point in the process, the appellant signed a Fort Hood Form 600–X17, which had a space for the appellant to indicate any problems he noted in the urine collection process that day. The appellant did not note any problems in the urine collection process.

After all of the participants produced their specimens, SSG Phyall and CPT Wendell attempted to turn the boxes of specimens in to the installation biochemical testing collection point, but the office was closed for lunch. They returned to the unit area and placed the boxes in CPT Wendell's office. Staff Sergeant Phyall departed without signing the urine specimens over to CPT Wendell on the chain of custody document that accompanied them. Captain Wendell then locked his office and left for lunch. When he returned and unlocked the door, the boxes were where SSG Phyall left them. He and SSG Phyall then transported the boxes to the collection point, where they were processed and mailed to the Army's drug testing lab in Hawaii.

The appellant's specimen was one of two in the unit to test positive for a metabolite of cocaine. Testimony from the government expert established beyond any reasonable doubt that the extremely high concentration of the cocaine metabolite in the specimen could not have been produced by contamination of the specimen with raw cocaine, and that the specimen could not have tested positive as the result of contamination by any other specimen being tested at the lab.

A. *Admission of the Urinalysis Results*

In an Article 39(a), UCMJ, session prior to entry of pleas, the appellant challenged the urinalysis inspection, arguing it was a pretext for an otherwise unlawful search, thus preserving this issue for appeal. The military judge denied the appellant's motion to suppress, making findings of fact and conclusions of law. The appellant argues that the military judge abused his discretion in denying the motion to suppress.

The appellant also contends that the deviations in the urine collection and transport process were so pervasive that the military judge abused his discretion when he admitted the test results. The trial defense counsel did not object at trial to the admission of the test results and testimony thereon, or to the documents that accompanied the urine to the laboratory. The appellant seeks to avoid the application of waiver by couching his appellate argument as a failure of the military judge to find, sua sponte, the results unreliable, or, in the alternative, as a challenge to the factual sufficiency of the evidence against him.

### 1. Motion to Suppress

A military judge's ruling on the admission of evidence, including his ruling on a motion to suppress, is reviewed for an abuse of discretion. *See United States v. Ayala*, 43 M.J. 296, 298 (1995). A ruling on a motion to suppress is a mixed question of fact and law. We ordinarily reject a military judge's findings of fact only if we find they were clearly erroneous; we review his conclusions of law de novo. *See United States v. Burris*, 21 M.J. 140, 144 (C.M.A.1985).

In his motion to suppress, the trial defense counsel argued that the unit urinalysis was merely a subterfuge for an otherwise illegal search. He contended that this examination of the unit immediately followed the report of an offense and was not previously scheduled. He also argued that specific individuals were singled out for testing and that the appellant was subjected to a substantially different intrusion during the urinalysis. Thus, the defense argued that, under Military Rule of Evidence 313(b) [hereinafter Mil.R.Evid.], the burden was on the government to prove by clear and convincing evidence that the examination was an inspection.

What differentiates an inspection from a search is the purpose for which it is conducted. The focus is on the commander's "primary purpose" for ordering the examination of the whole or a part of his unit. Mil. R.Evid. 313(b). An inspection is conducted with the primary purpose of ensuring the security, fitness, or good order and discipline of a military unit. A search is conducted with the primary purpose of obtaining evidence for use in trials or other disciplinary proceedings. Thus, the focus in this case is properly on CPT Wendell's primary purpose in ordering the examination of a part of his unit. *See* Mil.R.Evid. 313(b).

The military judge ruled that: "Captain Wendell's primary purpose in having a 30 percent urinalysis of his company was because he wanted to do a large enough sampling to validate or not validate that there were drugs being used in his company, and he additionally was very concerned about the welfare, morale, and safety of the unit caused by drugs."

These findings on the issue of primary purpose are findings of fact. *See United States v. Shover*, 45 M.J. 119, 121 (1996). While the military judge could have more clearly articulated his finding that the commander's primary purpose was preserving the safety and welfare of his soldiers and his unit, that is the fair implication of what he said. His ruling explained that the rationale for the larger-than-usual percentage tested was the commander's desire to increase the odds of detecting any drug users. The overarching reason for the 9 July 1996 urinalysis itself was the safety and welfare of the command.

The purpose of *any* urinalysis is to detect and deter drug use; that is why the urine is tested for drugs, whether the urine is collected as the result of a random, previously scheduled inspection, a command directed urinalysis based on reasonable suspicion, or a search based upon a probable cause authorization. Although CPT Wendell wanted to determine if SGT Foreman was correct in her assertions that members of his unit were using drugs, his primary purpose was to

protect the morale, welfare, and safety of his unit. While he acknowledged that the battalion commander's previous treatment of drug offenses meant that some disciplinary action was likely for those who tested positive, his primary focus was on the effect drug abuse could have on his unit. As he testified:

> Obviously, you don't want someone doing ... that's doing drugs operating a Super– HET [heavy equipment transporter] that has 71 tons on the back of it. It's not safe.... I could have ignored [sic] and said, "No probable cause" and continue as things happen. Then, two days later, one of my soldiers, after the long weekend, could be on drugs and operating a HET and kill someone. That would not be ... that would have been ... I wouldn't have been fulfilling my duty as a commander.

We conclude that the military judge's findings were not clearly erroneous, were amply supported by the evidence of record, and we adopt them as our own. Further, we find as a fact that CPT Wendell's primary purpose in ordering the urinalysis inspection on 9 July 1996 was to protect the health, welfare, and safety of his unit and soldiers. *See* UCMJ art. 66(c).

Turning then to the military judge's conclusion that this urinalysis was a valid inspection under Mil.R.Evid. 313(b), we review this legal conclusion de novo. When a urinalysis or examination is conducted, the timing of an examination, who was selected to be examined, and how the examination was conducted may each trigger application of a clear and convincing evidence standard to determine whether the examination was a valid inspection under Mil.R.Evid. 313(b). We need not decide if application of this more stringent standard was triggered by the evidence in this case, however, because the military judge actually applied this more stringent standard, and specifically found that the commander's primary purpose was established by clear and convincing evidence. We agree with his determination.

■ As our superior court has noted, there is no requirement in Mil.R.Evid. 313(b) that an inspection be preplanned or randomly scheduled. *See United States v. Jackson,* 48 M.J. 292, 294 (1998). Evidence obtained

from an inspection for drugs conducted after the report of drug use within a unit is admissible, so long as the primary purpose is unit readiness, not disciplinary action. *See Jackson,* 48 M.J. at 294; *see generally United States v. Rodriguez,* 23 M.J. 896 (A.C.M.R. 1987). What is required is a finding by the military judge that the government has established by clear and convincing evidence a permissible primary purpose for the inspection. *See Shover,* 45 M.J. at 122; Mil. R.Evid. 313(b). The military judge made the requisite finding that the government met the clear and convincing evidence test.

Reviewing this conclusion of law de novo, we concur. The facts of this case are remarkably similar to those in *Jackson.* In *Jackson,* immediately after the report of a drug sale within the unit area, Jackson's commander sought approval to search his room. When informed that the information was not sufficiently reliable for a probable cause search, the commander ordered a health and welfare inspection of his entire barracks and secured the assistance of a drug detection dog and an agent from the Criminal Investigation Division Command in making the inspection.

In *Jackson,* the court noted that meeting the clear and convincing evidence test is dependent on the facts and circumstances of the case, and that the nature of the contraband sought is a permissible consideration. *See Jackson,* 48 M.J. at 296. Because drug use has significant potential to damage a unit, the commander and the military judge may consider such potential for damage in determining if the primary purpose of the inspection was administrative (to ensure the health, welfare, safety, and morale of a unit and its members). *See Jackson,* 48 M.J. at 295–96. The record here amply supports the conclusion that the 9 July 1996 urinalysis was a valid inspection within the meaning of Mil. R.Evid. 313(b).

2. Deviations in the Collection Process and Factual Sufficiency of the Evidence

The appellant also challenges the admission of the urinalysis test results in this case because of the flaws in the collection process. We note that the trial defense counsel failed

to object on this basis to the admission of the litigation packet, the urine collection bottle, the chain of custody document, and the testimony of Lieutenant Colonel (LTC) Jacobs, the expert witness who explained the test results.[4] His failure to object was a tacit acknowledgement that the flaws in the collection process went to the weight to be accorded the evidence, not to its admissibility. *See United States v. Maxwell*, 38 M.J. 148, 152 (C.M.A.1993). The failure to object waives any error relating to the admissibility of the test results. *See United States v. Coleman*, 32 M.J. 508 (A.C.M.R.1990); Mil.R.Evid. 103(a)(1). Moreover, reviewing the military judge's decision to admit the documentary evidence and testimony, we are convinced that it was not a clear abuse of the military judge's broad discretion to do so. *See generally United States v. Johnson*, 46 M.J. 8 (1997). Thus, we necessarily find no sua sponte duty on the part of the military judge to refuse to admit the urinalysis results.

■ However, the appellant also argues that the evidence is factually insufficient to sustain his conviction. When reviewing a case for factual sufficiency, we must weigh the evidence, and, making allowances for not having personally observed the witnesses, we must be convinced of the appellant's guilt beyond a reasonable doubt. *See United States v. Turner*, 25 M.J. 324 (C.M.A.1987). Thus, we must be satisfied that the appellant knowingly and wrongfully used cocaine.

■ To sustain a conviction based upon fungible evidence such as urine, the government must demonstrate a reasonable probability that the urine was taken from the appellant, and that it was preserved unaltered until it was tested at the laboratory. *See Maxwell*, 38 M.J. at 150. Technical violations of regulatory requirements do not, per se, render test results of fungible evidence inadmissible. *See United States v. Pollard*, 27 M.J. 376, 377 (C.M.A.1989) (citing *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979)).

■ None of the regulatory deviations noted at trial or before this court render the urine test results unreliable or otherwise inadmissible. While there was a technical break in the documentary chain of custody when SSG Phyall surrendered the specimens to CPT Wendell, CPT Wendell testified that he secured the specimens during this period. His testimony adequately bridged the gap in the chain of custody. *See United States v. Gonzales*, 37 M.J. 456 (C.M.A.1993).

We are satisfied that the urine that tested positive for a cocaine metabolite at the laboratory in Hawaii was the urine produced by the appellant at the 9 July 1996 unit inspection, and that the urine was transmitted, unaltered, from the appellant to the laboratory. While there were numerous deviations from the prescribed collection practices, they were in the nature of technical deviations that did not affect the integrity of this particular specimen. We, therefore, conclude that the government met its burden to prove that the appellant's urine contained the cocaine metabolite.

After weighing the evidence and making allowances for not having personally observed the witnesses, we are ourselves convinced that the appellant knowingly and wrongfully used cocaine.

### B.  *Post–Trial Challenge for Cause*

After the conclusion of the trial, a member of the court-martial panel, Sergeant Major (SGM) Mullen, had a chance encounter with two NCOs assigned to the office of the staff judge advocate. During that conversation, SGM Mullen disclosed certain matters that led the military judge to convene a post-trial Article 39(a), UCMJ, session. Both NCOs testified, as did SGM Mullen.

The evidence at the post-trial session disclosed that SGM Mullen was the Sergeant Major for the Directorate of Community Activities (DCA) at Fort Hood. The installation biochemical testing program was one of the many entities that fell under the DCA's responsibility. At trial, SGM Mullen recognized a government witness, Private First

---

4. Trial defense counsel did, however, argue a motion for a finding of not guilty pursuant to Rule for Courts–Martial 917 [hereinafter R.C.M.],

on the basis that this evidence was so unreliable as to preclude the appellant's conviction thereon.

Class (PFC) Saenz, from the installation bio-chemical testing office, as he had counseled PFC Saenz about some financial matters in the past. He did not bring his previous association with PFC Saenz to anyone's attention prior to the conclusion of the trial.

At both the brief encounter with the two NCOs and at the Article 39(a), UCMJ, session, SGM Mullen denied that his relationship with PFC Saenz affected him in any way in the course of the trial. His contact with PFC Saenz was limited and strictly professional; he was not PFC Saenz's direct supervisor; he did not rate PFC Saenz. In his position as the Sergeant Major for the DCA, SGM Mullen was many layers removed from the installation drug program. Sergeant Major Mullen noted that PFC Saenz's testimony was of minor importance to the issues raised in the case.[5]

Sergeant Major Mullen testified that he had formerly served as an inspector in an Inspector General's office while stationed in Germany, and was aware that perceptions of unfairness could be generated without any actual bias existing. For this reason, he thought that his position as the DCA Sergeant Major should preclude his detail to future courts-martial involving drug testing, although his actual involvement with the testing program was superficial.

After extensive examination of SGM Mullen by both counsel and the military judge, the defense counsel challenged him for cause. The record is clear that the challenge was made on the basis of actual bias. The military judge denied the challenge.

■ During trial, challenges for cause against any member may be made and sustained upon a finding of actual or implied bias. See *United States v. Warden,* 51 M.J. 78 (1999); *United States v. Dinatale,* 44 M.J. 325 (1996); *United States v. Deain,* 5 U.S.C.M.A. 44, 17 C.M.R. 44, 1954 WL 2582 (1954); R.C.M. 912(f). Actual bias focuses

on the ability of the challenged member to render a fair and impartial verdict. Implied bias focuses on the public perceptions of the military justice system, recognizing that courts-martial must not only be fair, but also be perceived as being fair. See *Dinatale,* 44 M.J. at 328; *United States v. Glenn,* 25 M.J. 278, 280 (C.M.A.1987).

■ This case, however, presents the issue of a *post-trial* challenge for cause against a member. The threshold requirement in post-trial challenges is much higher. To obtain a new trial based on a post-trial challenge, a party must demonstrate that a court member gave a dishonest—not merely mistaken—answer to a question posed to him, and that the truth would have given rise to a valid causal challenge. See *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). This two-pronged test is applicable to trials by courts-martial. See *United States v. Mack,* 41 M.J. 51, 55 (C.M.A.1994).

■ The record is devoid of any evidence of dishonesty by SGM Mullen. During voir dire, he was not asked if he knew PFC Saenz, nor was he asked about his position as the DCA Sergeant Major or about his duties vis-à-vis the installation drug testing program.

■ Having concluded that the appellant has failed to meet the threshold requirement to make a post-trial challenge for cause (the first or threshold prong of the test adopted by our superior court in *Mack*), it is unnecessary for us to determine if the appellant has met the second. We note, however, that while we have urged that challenges for cause be liberally granted, a professional association with a witness is not per se disqualifying. See *United States v. Napoleon,* 46 M.J. 279, 283 (1997). While SGM Mullen's personal concern for appearances is commendable, his peripheral involvement with supervision of the installation drug and alco-

---

**5.** Private First Class Saenz testified to receiving the urine specimens from SSG Phyall, making a minor correction to the documentation, and for-warding the specimens to Hawaii. He noted that the specimens took longer to arrive in Hawaii than the period specified in the regulation.

hol test program did not demonstrate bias, actual or implied, that would warrant a challenge for cause. *See Warden,* 51 M.J. at 82; *United States v. Ai,* 49 M.J. 1, 5 (1998). The military judge's denial of the post-trial challenge for cause was not an abuse of discretion.

The findings of guilty and the sentence are affirmed.

Senior Judge CAIRNS and Judge BROWN concur.